BARRY M. DECHTMAN, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. SIDPAUL CORPORATION, A NEW JERSEY CORPORATION, D/B/A LAUREL GARDENS, PAUL ZITO AND ROSALIE C. ZITO, DEFENDANTS-RESPONDENTS, AND GANDRIA REALTY, INC., A NEW JERSEY CORPORATION AND LAUREL GARDENS ASSOCIATES, A PARTNERSHIP, DEFENDANTS-APPELLANTS.

Argued February 23, 1982—Decided June 3, 1982.

548

*David N. Ravin* argued the cause for appellants Gandria Realty, Inc., etc., et al. (*Ravin & Kesselhaut*, attorneys).

*Robert J. Cirafesi* argued the cause for appellant Barry M. Dechtman, Inc., etc. (*Wilentz, Goldman & Spitzer*, attorneys).

*Alfred C. Clapp* argued the cause for respondents (*Clapp & Eisenberg* and *Anschelewitz, Barr, Ansell & Bonello*, attorneys; *Alfred C. Clapp* and *John L. Bonello*, on the brief).

The opinion of the Court was delivered by

SCHREIBER, J.

This case requires us to decide whether the terms of a contract for the sale of real estate are sufficiently certain to be specifically enforced. A major issue involves the effect of a due-on-sale clause in the existing first mortgage on the premises. The trial court granted specific performance to the Purchaser. A divided Appellate Division reversed, 178 *N.J.Super.* 444 (1981), and the Purchaser appealed pursuant to *R.* 2:2–1(a)(2). We reverse substantially for the reasons expressed in Judge Antell's dissenting opinion.

The facts have been detailed in the Appellate Division's opinion. Summarized in pertinent part they are as follows.

Sidpaul Corporation (Sidpaul) owned a 237 unit garden apartment complex in Eatontown. Dr. Paul Zito, the principal shareholder and president of Sidpaul, negotiated the sale of the property to Gandria Realty, Inc., which subsequently assigned the agreement to a partnership, Laurel Garden Associates (Purchaser). Extensive preliminary negotiations began in early February 1977. The parties drew three drafts of the contract before a final contract was made and executed on June 9, 1977.

The purchase price was $3,275,000. Payment was to be made as follows:

$25,000  on execution of the contract

275,000  on closing of title

800,000  by bond and purchase money mortgage; interest at 6% per annum; 10 year term; $200,000 amortization payment at end of 20 months; default in any first mortgage was to be "deemed a default under this mortgage"; the bond to be signed individually by Barry M. Dechtman (his corporation was the broker and he was one of the principals of the buyer).

The balance was reflected in the amount due under a note and first mortgage held by the United States Savings Bank of Newark. The agreement provided that the principal amount due on the note was $2,175,000, and if at closing the principal was less, one-half of the difference would be credited to the Purchaser and one-half to Sidpaul.

The controversy essentially surrounds the contract provision which concerns this mortgage. Paragraph 11 of the contract as finally agreed upon by the parties reads:

11. CONTRACT SUBJECT TO:

This Contract is expressly made subject to the following: (a) Approval by United States Savings Bank of Newark, New Jersey, of sale to Purchaser as contemplated herein on or before the date fixed for closing of title hereunder. In the event Purchaser is unable to obtain the above within the time period set forth herein, or said contingency is not waived by Purchaser, then and in that event, at the option of Purchaser, on written notice to the other party, this Agreement may be terminated and upon such termination, there shall be no further liability one party to the other except the return of the deposit money paid hereunder.

The United States Savings Bank mortgage had been executed on August 2, 1972 and represented the permanent financing subsequent to the construction of the garden apartments. The principal amount was $2,300,000 payable in equal monthly installments of $17,250 (principal and interest) for 15 years. The

loan could not be prepaid for seven years. If there were a change in ownership of the property, "then and in such event, the . . . [unpaid] principal sum with accrued interest shall, at the option of the Mortgagee, become due and payable immediately . . . ."

The Purchaser was unable to obtain the consent of the Bank to the proposed conveyance. Eventually the Bank agreed to permit the mortgage to be prepaid, provided it received a premium of 4%. This was not satisfactory to the Purchaser, who then waived the contingency of Bank approval and so advised Sidpaul's attorney. The Purchaser proposed to close and to take title subject to the first mortgage.

On the closing date, the Purchaser presented certified checks for $275,000 ($25,000 payment had been made shortly after execution of the contract) and was prepared to execute and deliver the $800,000 bond and purchase money mortgage. Sidpaul would not close because "a new mortgage commitment" had not been acquired and presented at the closing by the Purchaser.

The Appellate Division refused to order specific performance primarily because it found that the contract was uncertain in its failure to detail how the entire purchase price would be paid. Moreover, it construed paragraph 11 of the contract so that the buyer did not have the option to consummate the transaction without the mortgagee's consent.

I

Principles to be followed by a court in determining whether the remedy of specific performance should be granted are well settled. No one in this proceeding questions the soundness of these guidelines. A court must exercise its equitable discretion in deciding whether specific performance should be granted. That calls for a judgment of the party's conduct. Was it fair, just and reasonable? Will the relief be harsh or unreasonable?

Justice Francis in *Stehr v. Sawyer*, 40 *N.J.* 352 (1963), summarized the considerations governing the applicability of specific performance as follows:

> Such remedy is a discretionary one, resting in equitable principles. This means, among other things, that the party asking the aid of the court must stand in conscientious relation to his adversary; his conduct in the matter must have been fair, just and equitable, not sharp or aiming at unfair advantage. The relief itself must not be harsh or oppressive. In short, it must be very plain that his claim is an equitable one. Pomeroy, Equity Jurisprudence (5th ed. 1941), § 400, pp. 100–101. [*Id.* at 357]

■ The trial court has the responsibility to weigh the equities and to exercise its sound discretion. That court sees and hears the witnesses. It is in the best position to judge the demeanor, good faith and sincerity of the parties. The difference between that opportunity and relying on the words in a record is "frequently the decisive factor in matters of equity." *Stehr v. Sawyer*, 40 *N.J.* at 357.

■ The appropriateness of the specific performance remedy also depends upon the clarity of the terms of the contract. The oft-stated rule is that the terms of the contract must be definite and certain so that the court may decree with some precision what the defendant must do. 11 *Williston, Contracts* (3 ed. Jaeger), § 1414 at 810; 5A *Corbin, Contracts* (2 ed. 1964), § 1174 at 278. Whether the contract meets the test need not depend upon a literal reading. The court must also examine the situation of the parties and the accompanying circumstances to ascertain the meaning of the agreement. *See Fountain v. Fountain*, 9 *N.J.* 558, 565 (1952) (a promise capable of being made more certain by extrinsic facts is enforceable). Seeming difficulties of enforcement due to uncertainties attributable to language may vanish in the light of practicalities and a full understanding of the parties' intent. *See Moran v. Fifteenth Ward B. & L. Ass'n*, 131 *N.J.Eq.* 361 (Ch.1942). Reasonable certainty of the terms is sufficient. The two leading authorities on contracts have cautioned against refusal to order specific performance because of an apparent uncertainty in the terms of the contract. Professor Williston states:

It seems probable that the difficulty regarding uncertainty has been overemphasized; certainly, it should not be allowed to hamper or restrict equitable relief further than necessity requires. [11 *Williston, supra*, § 1424 at 819]

Professor Corbin agrees:

There are cases in which the court has made a mountain out of a molehill and ·refused a decree that might well have been granted. Apparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implications of fact. [5A *Corbin, supra*, at 283]

Applying all the foregoing principles, we are satisfied that this contract is sufficiently definite to order specific performance.

## II

Paragraph 11 of the contract requires the consent of the first mortgagee to the conveyance unless the Purchaser waives the requirement or rescinds the transaction. The trial court concluded that the parties intended to give the Purchaser the option to waive the contingency clause and close without the permission of the mortgagee. The record amply supports this finding. *State v. Johnson*, 42 *N.J.* 146, 162–64 (1964). First, the language of the clause in the executed contract gives the option to the Purchaser—and the Purchaser alone—to waive the requirement of the Bank's approval of the sale. If the Bank would not agree to the transfer, the Purchaser had the choice of either terminating or consummating the transaction. Second, the history of paragraph 11 of the contract supports the Purchaser's position. During the three prior drafts of the contract, the parties had differences of opinion on the clause. Dr. Zito had been insisting that Sidpaul and not the Purchaser have this option. The last draft prior to the final contract read as follows:

11. CONTRACT SUBJECT TO:

This Contract is expressly made subject to the following: (a) Approval by United States Savings Bank of Newark, New Jersey, of sale to Purchaser as contemplated herein on or before the date fixed for closing of title hereunder. (b) Purchaser obtaining on or before the date fixed for closing of title hereunder, a mortgage commitment from a financial institution on terms and conditions satisfactory to Purchaser. In the event Purchaser is unable to obtain (a) and (b) above within the time period set forth herein, or said contingencies are not waived by Purchaser, then and in that event, at the option of Purchaser, on written notice to the other party, this Agreement may be terminated and upon

> such termination, there shall be no further liability one party to the other except the return of the deposit money paid hereunder.

At Dr. Zito's request provision (b) concerning a mortgage commitment was deleted. Additionally, he yielded and agreed that the option to waive remain with the Purchaser. Moreover, as indicated previously, after Purchaser's counsel advised Sidpaul that the Purchaser waived the contingency and would proceed to close, Sidpaul's counsel did not contest the right to waive, but insisted that the Purchaser have a commitment for a standby mortgage. Thus the Seller conceded that the Purchaser could acquire the property without the Bank's consent.

Sidpaul contends that a critical deficiency in the contract precluding specific performance was omission of any provision concerning payment of the balance of the purchase price after crediting the cash and purchase money second mortgage that amounted to $1,100,000. There is no such deficiency. The purchase price was $3,275,000 and the Purchaser was acquiring the property subject to a first mortgage of $2,175,000. The final figure was to be adjusted depending upon the actual principal amount of the mortgage outstanding on the closing date. We agree with Judge Antell's conclusion "that the parties intended the $2,175,000 balance to be satisfied by relieving Sidpaul of the obligation to liquidate the first mortgage; that the purchaser was to take subject thereto and be left free to deal thereupon with the first mortgage." 178 *N.J.Super.* at 459. As Judge Antell observed, whether the first mortgage would subsequently be foreclosed was not an essential term of the contract.[1] *Id.* at 458.

---

[1] It might be noted that the Purchaser here was to acquire the property *subject to* an existing mortgage. When one takes subject to a mortgage, one incurs no personal liability on the mortgage debt; one's liability is limited to one's interest in the property. On the other hand, if one *assumes* a mortgage, one becomes primarily liable for any deficiency remaining after the land has been appropriated to the satisfaction of the mortgage debt. *See* 29 *New Jersey Practice (Cunningham and Tischler, Law of Mortgages)* §§ 133, 136 (1975).

The Seller also argues that, since the first mortgage could not be prepaid, it would have been incredible for Sidpaul to have a second mortgage for $800,000 that would be in jeopardy if the conveyance was made without the Bank's consent. This contention is misconceived.

Sidpaul had received $300,000 for any risk entailed as well as a personal guarantee of Barry Dechtman[2] to the extent of the first $600,000 on the $800,000 second mortgage. Sidpaul assumed the contingency that there might be a default in the second mortgage, but for a price.

Sidpaul had the right of course to transfer its equity in the property irrespective of the consent of the mortgagee. A breach of the provision in the first mortgage calling for the Bank's consent did not automatically create a default. Default was dependent upon "the election of" (Note) or "at the option of" (Mortgage) the Bank. Whether the Bank would have declared a default and proceeded to foreclose was unknown.[3]

The Purchaser contends that the due-on-sale provision was not automatically enforceable. This contention involves several questions hitherto unresolved by this Court. Do such clauses unreasonably restrict the right of alienation? Should these clauses be automatically enforced irrespective of their underlying purpose? *See Century Federal Savings & Loan Ass'n v. Van Glahn*, 144 *N.J.Super.* 48 (Ch.Div.1976) (giving automatic enforcement); *Poydan, Inc. v. Kiriaki*, 130 *N.J.Super.* 141, 149–50

---

[2]Mr. Dechtman died during the pendency of the appeal. In his stead Dr. Jerrold Feigenbaum and Sanford Feld personally guaranteed the first $600,-000 due on the second mortgage. This substitution was agreeable to Sidpaul.

[3]Sidpaul included in its appendix a letter written by the Bank's counsel one month after the trial court's judgment setting forth the Bank's position at that time. This letter is not a part of the trial record. Nor was any motion made to enlarge the record for this purpose. We have disregarded its contents for the purpose of this appeal. *Pomanowski v. Monmouth County Board of Realtors*, 89 *N.J.* 306, 325 (1982); *County of Bergen v. Borough of Paramus*, 79 *N.J.* 302, 309 n.2 (1979); *R.* 2:5–4.

(Ch.Div.1974), aff'd o. b., 139 *N.J.Super.* 365 (App.Div.1976); *Malouff v. Midland Federal Savings & Loan Ass'n,* 181 *Colo.* 294, 509 *P.2d* 1240 (Sup.Ct.1973); *First Commercial Title, Inc. v. Holmes,* 92 *Nev.* 363, 550 *P.2d* 1271, 1272 (Sup.Ct.1976); *Stith v. Hudson City Savings Institution,* 63 *Misc.2d* 863, 313 *N.Y.S.2d* 804 (Sup.Ct. Broome Cty.1970); *Gunther v. White,* 489 *S.W.2d* 529 (Sup.Ct.Tenn.1973); *Miller v. Pacific First Federal Savings & Loan Ass'n,* 86 *Wash.2d* 401, 545 *P.2d* 546 (Sup.Ct.1976) (automatic increase in mortgage interest rate upon transfer held valid); *Mutual Federal Savings and Loan Ass'n v. Wisconsin Wire Works,* 71 *Wis.2d* 531, 539, 239 *N.W.2d* 20, 24 (Sup.Ct.1976). Or must there be a showing that the transfer has increased the lender's risks causing the security to be impaired or jeopardized? *See Patton v. First Federal Savings and Loan Ass'n,* 118 *Ariz.* 473, 478–479, 578 *P.2d* 152, 157–58 (Sup.Ct.1978) (due-on-sale clause unenforceable unless it could be shown that security would be jeopardized by transfer); *Dawn Investment Co. v. Superior Court,* 30 *Cal.3d* 695, 180 *Cal.Rptr.* 332, 639 *P.2d* 974 (Sup.Ct.1982) (same as applies to institutional lender); *Wellenkamp v. Bank of America,* 21 *Cal.3d* 943, 148 *Cal.Rptr.* 379, 582 *P.2d* 970 (Sup.Ct.1978) (same as applies to private lender); *Nicholas v. Ann Arbor Federal Savings & Loan Ass'n,* 73 *Mich.App.* 163, 250 *N.W.2d* 804 (Ct.App.1977); *Sanders v. Hicks,* 317 *So.2d* 61, 64 (Sup.Ct.Miss.1975). *See generally Fidelity Land Development Corp. v. Rieder and Sons,* 151 *N.J.Super.* 502, 508–14 (App.Div.1977).

The Purchaser was prepared to defend a foreclosure action on the ground that the transfer of ownership did not automatically trigger the due-on-sale clause because the Bank's security was not impaired or adversely affected. Indeed, the Bank may ultimately have decided not to foreclose. Furthermore, as Judge Antell cogently explained in his dissent:

> If the first mortgagee decides to accelerate and declare the balance due, the purchaser will then have to pick among available alternative responses. It could obtain financing elsewhere and liquidate the accelerated balance, or it might challenge the mortgagee's right to accelerate. In the latter case, the mortgagee could declare the mortgage in default and the rights of the parties would be

resolved under equitable principles relevant to the issues as they may then be framed. But this is substantially the same situation which would exist if in fact the purchaser had expressly assumed the mortgage with the first mortgagee's approval and then defaulted in payments.

The terms of the contract are certain. What is uncertain is not whether the Purchaser agreed to take title subject to the mortgagee or what the amount of the mortgage would be, but what would result from litigation between the Purchaser and the Bank if the Bank were to foreclose on the mortgage. However, this situation is precisely what the contract contemplates, resulting as it does from the parties' keen bargaining over the provisions of paragraph 11.

Sidpaul relies upon several cases for the proposition that the terms are so uncertain that specific performance is not warranted. The cases cited are factually distinguishable. In *Moore v. Galupo*, 65 *N.J.Eq.* 194 (Ch.1903), the contract provided that the purchase price would be secured by a "mortgage or mortgages on said premises bearing six percent per annum interest." There was no evidence as to the time or times of payment, the number of mortgages, and if more than one, whether they should be concurrent or successive. In *Alnor Construction Co. v. Herchet*, 10 *N.J.* 246 (1952), the property description was so inadequate that the Court could not determine what land was to be conveyed. In *Malaker Corp. v. First Jersey Nat'l Bank*, 163 *N.J.Super.* 463, certif. den., 79 *N.J.* 488 (1979), the terms of the loan, including rate of interest, repayment provision and duration, were unknown. In *Heim v. Shore*, 56 *N.J.Super.* 62 (App. Div.1959), the terms of the mortgage, including the amount, amortization payments and interest rate, were not established.

Unlike these cases, this contract specifies the terms of the second mortgage, including interest rate, duration and amortization. Moreover, metes and bounds descriptions of the properties are attached to the agreement. This contract does not contain the uncertainty in its essential terms as is present in the cases advanced by the defendant.

Sidpaul also contends that in the absence of consent the Purchaser had to have a new mortgage commitment to refinance the existing mortgage. No such provision exists expressly or impliedly in the purchase contract. Nor does the record contain any evidence that the parties even discussed such a requirement before the contract was made. As the trial court observed, this proposition was not raised until shortly before the closing.

Enforcement of the contract is not unduly harsh or unreasonable. This is a commercial transaction between knowing parties, assisted by attorneys who had considerable experience in realty matters. The final contractual provisions evolved only after a series of conferences among the principals, their tax consultants, and their attorneys. Sidpaul decided to take a business risk that there might at some time be a default in the first mortgage that would trigger a default in its second mortgage. Sidpaul did not know whether that risk would come to pass. The possibility of acceleration by the mortgagee does not justify denial of specific performance. *See DaSilva v. Musso,* 53 *N.Y.2d* 543, 550, 444 *N.Y.S.2d* 50, 54, 428 *N.E.2d* 382, 385 (Ct.App.1981). *Cf. Casriel v. King,* 2 *N.J.* 45 (1949) (where vendee undertook to run risk of apparent deficiency of title, specific performance granted to vendor). Further, Sidpaul did not expose itself without some compensation. It was not required to pay the realtor's commission and would have received $300,000 at the closing. In addition, it would have in hand a personal guaranty of $600,000 with respect to the indebtedness secured by its second mortgage.

The trial court ordered that the broker's commission be satisfied at the closing by the Purchaser. This accords with the purchase contract and we reject the Purchaser's claim that the commission be paid by Sidpaul. We also agree that all adjustments be made as of the actual day of closing. To the extent that the principal amount of the Bank mortgage is less than $2,175,000, the seller shall be entitled to a credit of 50% of the

difference. The purchase money second mortgage shall conform with the provisions in the agreement except that the personal payment guarantee of the first $600,000 shall be made by Jerrold M. Feigenbaum and Sanford I. Feld. We do not agree with the trial court that a declaration of default by the Bank by virtue of the due-on-sale clause shall not constitute a default on the second mortgage. That determination is premature and the matter is not ripe for disposition. Except as noted above, we adopt the terms of the trial court's judgment of February 13, 1979.

The cause is remanded to the trial court to enter a judgment conforming with this opinion and to fix a closing date within 60 days from the date of this decision.

Reversed and remanded.

*For reversal and remandment*—Justices PASHMAN, CLIF-FORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*For affirmance*—None.