226 N.J. Super. 119 (1988)
543 A.2d 977
GEORGE H. BECKER, JR. AND PATRICIA F. BECKER, H/W, LLOYD C. NELSON AND ANN NELSON, H/W, HENRY WEBER, THOMAS PIZZO, ANDREW E. MCGUIRE AND JEAN G. MCGUIRE, H/W, LEONARD T. CAMPI AND MARYANNA CAMPI, H/W, INDIVIDUALS, PLAINTIFFS-APPELLANTS,
v.
SUNRISE AT ELKRIDGE, A PARTNERSHIP, A NEW JERSEY GENERAL PARTNERSHIP ("SAE"), AS THE SUCCESSOR DEVELOPER OF A CONDOMINIUM DEVELOPMENT NOW KNOWN AS "SUNRISE AT ELKRIDGE" (HEREINAFTER "SUNRISE AT ELKRIDGE"), ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 1, 1988.
Decided June 30, 1988.
*120 Before Judges MICHELS, SHEBELL and ARNOLD M. STEIN.
Thomas D. McCloskey argued the cause for appellants (McCloskey and Irene, attorneys; Thomas D. McCloskey, of counsel and on the brief; Ernest A. Spinello, Jr., on the brief).
*121 Sam Maybruch argued the cause for respondents (Grebow, Drobbin & Van Deventer, attorneys; Sam Maybruch, of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Plaintiffs George H. and Patricia Becker (Becker), Lloyd C. and Ann Nelson (Nelson), Henry Weber, Thomas Pizzo, Andrew E. and Jean C. McGuire (McGuire) and Leonard T. and Maryanna Campi (Campi) appeal from a judgment of the Chancery Division which denied their demands for specific performance of written condominium purchase agreements. Plaintiffs entered into the agreements with defendant Elkridge Realty Associates (ERA) to purchase townhouse condominium units in a project then known as "Elkridge Estates, a Condominium" located in Red Bank, which project was then under development and construction by ERA.
Defendant ERA, after the execution of the purchase agreements, contracted to sell the entire project to defendant Sunrise at Elkridge (SAE), a partnership comprised of two corporations, U.S. Condominium Corp. and Centurian Systems Inc. After title was conveyed to SAE, the project assumed the name "Sunrise at Elkridge, a condominium."
The various purchase agreements were entered into by the plaintiffs and ERA between February 1984 and August 1984. ERA contracted with SAE on March 11, 1986. On May 29, 1986, SAE furnished plaintiffs with notice of the change in ownership and extended a one-time, 10-day offer to plaintiffs to re-contract with SAE to purchase the same townhouse units that each plaintiff had already contracted with ERA to purchase. The new contracts were to be at an increased purchase price of between $47,500 and $85,000 depending upon the model.
SAE has refused to honor the original contracts on the basis of Paragraph 12, contained in each contract, which provides:

*122 12. Default of Seller. If the Seller shall not comply with or render compliance with its obligations under this Agreement for any reason whatsoever, other than the Seller's arbitrary and willful refusal to close title hereunder, the sole obligation of the Seller and the sole right of Purchaser shall be the return of all payments made by the Purchaser hereunder without interest, together with the reasonable cost of title searches and survey, and upon such repayment, this agreement shall be terminated and both parties hereto shall be released from all further obligations arising out of, or in any manner relating to this Agreement; provided, however, that the parties hereto agree that (a) if the satisfaction of the requirements to be satisfied by Seller is prevented or delayed by a national emergency, governmental restrictions, lack of governmental allocations, inclement weather; strikes, lock-outs or other labor disputes affecting Seller or any of Seller's suppliers of material or labor, delay in issuance of permits or mortgage commitments or inspections or any other circumstances beyond Seller's control, Seller shall have the right to postpone the closing date for not more than six (6) months; (b) if such satisfaction is prevented or delayed for any other cause whatsoever and the cause or delay is for reasons outside Sponsor's control, Seller shall have the right to postpone the closing date for not more than three (3) months in addition to those provisions set forth in Paragraph 5 above. If Seller is unable to convey title in accordance with its agreement by such postponed closing date, Seller will refund without interest all money on account by Purchaser; however, Seller shall in addition reimburse to Purchaser all costs of title company regarding searches and all costs of survey.
Certain of the contracts modified Paragraph 12 as follows:
Weber/ERA Agreement  deleted the original reference to "mortgage commitments" as being a cause of delay under the contract.
Becker/ERA Agreement  addendum to Paragraph 12:
12. Continuation  Default of Seller  In addition, if Seller as the result of a national emergency, government restrictions, lack of government allocations, inclement weather, strikes, walk outs, or other labor disputes, is unable to close on or about December 15, 1984, then Seller shall notify Purchaser in writing of its inability to close on the date set forth herein. Seller further agrees to provide Purchaser with as much advance notice as possible of its inability to perform on the aforesaid closing date.
Nelson/ERA Agreement  provided more information regarding right of Nelson to cancel in the event of seller's default:
1. Purchaser shall have the right to cancel the within Agreement by furnishing written notice of cancellation to Seller within thirty (30) days after substantial completion of the model for the unit being purchased. Failure of the Purchasers to furnish such written notice of cancellation to the Sellers within the applicable thirty (30) day period shall be deemed a waiver of the within cancellation right.

*123 2. Notwithstanding anything herein or in the subject agreement to the contrary, in the event the model is not completed on or prior to January 1, 1985, the Purchaser shall have the right to cancel the within agreement by furnishing written notice to the Seller.
3. Closing of title shall occur on or about October 1, 1984.
Campi/ERA Agreement  amended original Paragraph 12 as follows:
3. Paragraph 12 of the initial contract shall be and hereby is amended to reflect the fact that should Seller default, Seller shall return all deposit monies paid hereunder, together with interest thereon together with the reasonable cost of the title searches and survey to the Purchaser, at which time this agreement shall be terminated and both parties hereto shall be released from all further obligations arising out of the Agreement. Paragraph 12 shall also be amended to reflect the fact that the Sellers shall have the right to postpone the closing date for not more than three months rather than the six months provided for under the conditions set forth in Paragraph 12, Section (a).
Plaintiffs' damage claims were ultimately bifurcated and the specific performance issue proceeded to trial. The trial court denied plaintiffs' specific performance claims. The trial judge further ordered that plaintiffs' sole remedy was the return of all contract deposit monies previously paid by plaintiffs, along with prejudgment interest and, where applicable, contractual interests and costs incurred by plaintiffs for title searches and/or survey preparation fees.
From December 28, 1983 until May 27, 1986, ERA undertook construction of the Elkridge Estates project to consist of sixty-eight luxury townhouse condominium units in twelve buildings. ERA entered into written Purchase Agreements with plaintiffs. The seven agreements are summarized as follows:

 Total
 Date of Unit Purchase Closing Deposit
Name Contract No. Price Date Made 
Thomas Pizzo 2/13/84 I-2 $130,000 120 days $13,000
Thomas Pizzo 2/13/84 G-4 $130,000 after binding $13,000
 contracts
 entered into
 for all units
 in bldg.
 where unit
 is located.

*124
Henry Weber 2/16/84 I-4 $150,000 9/15/84 $15,000
George Becker 4/27/84 G-6 $150,000 12/15/84 $15,000
Patricia Becker
Lloyd Nelson 5/21/84 H-1 $175,000 "on or $17,500
Ann Nelson about"
 10/1/84
Andrew McGuire 6/15/84 J-4 $179,900 No date $17,990
Jean McGuire specified
Leonard Campi 8/9/84 L-1 $187,500 No date $9,375
Maryanna Campi specified (Balance of
 dep. to be
 pd. 90 days
 prior to
 date set for
 closing 
 not tendered
 as no date
 was set).

None of the plaintiffs have canceled their agreements with either ERA or SAE.
The March 11, 1986 contract between ERA and SAE specifically identified each plaintiff's contract as to unit, purchase price and deposit. Paragraph 4 of the Rider to the ERA/SAE contract contained the following pertinent language:
4. EXISTING CONTRACTS. The Seller has disclosed and the Purchaser recognizes that there may be in existence, of questionable validity, contracts for twelve (12) of the sixty-seven (67) condominium units which are the subject of this Agreement....
........
(d) Purchaser expressly disclaims the validity of the aforesaid 12 contracts and declares that at conveyance, the property shall not be encumbered by same in any way. In the event of any claim against Seller by reason of said contracts or Purchaser's disclaimer, Purchaser agrees to undertake the defense of Seller at Purchaser's expense and to hold Seller harmless from such claim. This provision shall survive closing.
SAE claimed the original contracts were invalid because SAE was permitted to terminate them pursuant to Paragraph 12.
*125 Plaintiffs testified at trial as to how they became interested in the condominium project, and how pre-contract negotiations were carried out. Plaintiffs also testified as to repeated assurances given them by the original developer concerning the progress of construction when plaintiffs either visited the site or sent correspondence. Also, plaintiffs Pizzo, McGuire and Campi testified that while no actual closing dates were specified in their contracts, several dates and time frames for closing were established by assurances of ERA representatives.
Only two of the proposed sixty-eight units were completed and delivered by ERA due to delay problems encountered on the project. Defendants claim these were unforeseen and not within the seller's control. The delays included an unusually large amount of rainfall causing flooding on the site and adjoining properties resulting in a stop-work order issued by the Borough of Red Bank until a storm water retention basin was repaired; defective and deficient work performed by a subcontractor who had to be fired; shortages in workers and materials, and various encounters with the borough regarding off-site improvements.
Jacob Elkes, a director of U.S. Condominium Corp., one of the partners of SAE, testified regarding the status of each unit in question both when SAE took over the project in May 1986 and at the time of trial. His testimony can be summarized as follows:

 Unit
Name No. Status as of 5/27/86 Status as of trial date 
Pizzo G-4 Not started Has siding, roof, but interior
 and mechanical systems not
 installed.
Pizzo 1-2 Shell had siding, Enclosed, mechanical systems
 roof, windows, but partially complete, heating and
 interior was plumbing still required,
 incomplete, some electrical work still to be
 plumbing and sewer. completed, sheet rock, paint,
 cabinetry, floor covering and
 ceramic tile still required,
 painting, installation of doors
 and trim work.

*126
Weber I-4 SAME AS I-2, SAME AS I-2, ABOVE
 ABOVE
Becker G-6 SAME AS G-4, SAME AS G-4, ABOVE
 ABOVE
Nelson H-1 Shell had siding, Requires electrical, plumbing,
 roof, incomplete heating, sheet rock, doors,
 interior. cabinetry, ceramic floor, paint,
 finishes, faucets, electrical
 outlets.
McGuire J-4 Not started Framing completed with roof.
Campi L-1 Not started Footings just poured.

The trial judge found that the only element that was "somewhat unspecific in all of the contracts ... based upon the subsequent developments is the time at which title is to be conveyed." Regarding the Pizzo, Campi and McGuire contracts, the judge found that the lack of definiteness with regard to closing date rendered these contracts ineligible for an award of specific performance.
As to the contracts with actual closing dates, the judge held specific performance was not an available remedy due to the unfinished state of the units making plaintiffs' contracts analogous to "building" and "construction" contracts, which, if specifically enforced, would require the court to function as "clerk of the works." The judge would not grant specific performance especially in the situation of a condominium development which would require that the court supervise
not just the construction of the unit but also that to which the purchasers are entitled: their share of the common elements. So a judge would be supervising the streets and sidewalks and the sewers and all those other things in a condominium development which are common elements and if the principle applies strongly in any building contract case it obviously applies in spades where you're talking about a condominium development type situation that we're dealing with here.
*127 Further, in denying plaintiffs' application for specific performance, the trial court ruled that by virtue of Paragraph 12 each plaintiff had "bargained away" his or her right to institute a suit based on this equitable remedy. According to the trial judge's interpretation of Paragraph 12, purchaser's sole remedy in the event of seller's default would be the return of deposit money, plus interest where applicable. The judge appeared satisfied that none of the delays encountered on the job were the fault of defendant-seller and that therefore Paragraph 12 was properly applicable.
We have held that a contract for sale of a designated condominium unit is specifically enforceable by a purchaser in proper circumstances. Pruitt v. Graziano, 215 N.J. Super. 330 (App. Div. 1987). We noted in Pruitt, under the Condominium Act, N.J.S.A. 46:8B-1 et seq., each condominium unit constitutes a separate parcel of real property, N.J.S.A. 46:8B-4, and under "long established equity principles, a contract for the sale of real property is specifically enforceable by the purchaser." 215 N.J. Super. at 331.
In determining that specific performance was unavailable, the trial judge relied on the "principle" that courts will not supervise building or construction contracts. See, e.g., Lester's Home Furnishers v. Modern Furniture Co., 1 N.J. Super. 365, 368 (Ch.Div. 1948). The Lester court, however, recognized that "not unlike many general rules and policies, there are exceptions." Ibid. The chancery judge in Lester appears to have denied specific performance on the premise "that Chancery will not assume to compel a defendant specifically to perform a contract to build, construct, or repair a building situate upon the plaintiff's land or upon land over which the plaintiff maintains legal control." Ibid. In the instant case, plaintiffs are neither in possession of the land nor do they maintain legal control.
DiCataldo v. Harold Corp., 15 N.J. Super. 471 (Ch.Div. 1951) involved a request for specific performance by a purchaser who *128 had contracted for a lot and a house to be constructed on it. Id. at 473-74. The agreement provided for the premises "to consist of a one-family dwelling, slab construction, radiant heat, 33' X 26'," and was dependent upon the approval of the Federal Housing Administration (FHA) or the Veterans Administration (VA). Id. at 477-78. The court found that the agreement was "too indefinite for specific performance as to the type of building or the plans under which same was to be erected." Id. at 477.
In the instant case, the plans are sufficiently definite as witnessed by the floor plans attached to the contracts and by the actual start of construction, almost to completion in some cases, of the units. It is clear from defendant SAE's letters to plaintiffs that SAE is able and willing to complete the units, providing they do so at a higher price.
Dworman v. Mayor & Bd. of Aldermen, Etc., Morristown, 370 F. Supp. 1056 (D.N.J. 1974) involved a construction contract where work was to be performed by both plaintiff and defendant, id. at 1060, and compliance with the contract rested upon the will or discretion of an uncontrolled third party. Id. at 1077-78. The judge in Dworman found it unnecessary to decide the "difficult issues" involved with the specific performance question because he found that the steps necessary to complete construction were being taken "with all possible speed." Id. at 1078.
We are satisfied that specific performance would be an appropriate remedy if plaintiffs are otherwise entitled to enforcement of their contracts.
Equity's jurisdiction to award specific performance of a contract is exercisable unless the remedy at law is adequate and complete and as efficient as the remedy of specific enforcement [citation omitted]. In the language of Lord Selborne, the ruling principle is that specific performance will be given if it will "do more perfect and complete justice." [Citation omitted]. [Fleischer v. James Drug Stores, 1 N.J. 138, 146 (1948)].
It is clear that plaintiffs' remedy at law would not be as adequate and complete or as efficient as the remedy of specific *129 enforcement. As plaintiffs argue, money damages are inadequate in such a situation, and the determination of their extent is incalculable.
SAE obviously plans to complete the project, with minor variations in individual units from the plans and specifications, including the specific units contracted for by plaintiffs. We see no reason why equity is unable or should be unwilling to order specific performance of the contractual obligations of defendant. There is no evidence as to why price increases are necessary or should be allowed under the contracts. While it may be inferred that the project problems and time delays between the original contracts and the takeover by SAE caused certain increased costs, SAE took control of the project with actual notice of the existing contracts. Plaintiffs did not contribute to the price increase and should not be denied their equitable and just remedy in these circumstances.
The lack of a specific closing date does not render the McGuire, Campi and two Pizzo contracts too indefinite for specific performance to be ordered. Although equity requires a greater degree of certainty in an action for specific performance than is necessary in an action at law for damages, Alnor Construction Co. v. Herchet, 10 N.J. 246, 250 (1952), reasonable certainty of the terms is sufficient. Barry M. Dechtman, Inc. v. Sidpaul Corp., 89 N.J. 547, 552, (1982).
It is well-settled that where no time is fixed for the performance of a contract, by implication a reasonable time was intended. River Development Corp. v. Liberty Corp., 45 N.J. Super. 445, 464 (Ch.Div. 1957), aff'd 51 N.J. Super. 447 (App. Div. 1958), aff'd 29 N.J. 239 (1959). This principle is applicable to contracts to purchase realty. Ibid. As stated in Lean v. Leeds, 92 N.J. Eq. 455, 456 (E. & A. 1921):
The only element ordinarily embodied in such contracts which is absent in this is the element of time for final payment and final delivery of the deed, but that element is not essential, so far as the express terms of the written contract is concerned, because in its absence a reasonable time will be implied.
*130 Defendants claim that the trial judge was correct in his interpretation that Paragraph 12 limited plaintiffs to a recovery of deposit monies because SAE was entirely within its rights to rely upon the language in that paragraph which sets forth the seller's obligations in the event of a seller's failure to comply with its contractual obligations. Plaintiffs contend that Paragraph 12, limiting seller's liability, logically can only be called into play if a choice is made by the buyer to hold seller liable in an action at law for construction delays.
We have not been made aware of any cases directly dealing with this issue in similar circumstances. However, we believe that the following regulation of the New Jersey Code relating to PREDFDA gives some indication of the perspective from which Paragraph 12 should be viewed.
[I]t shall be unfair and unreasonable for any of the following clauses or provisions to appear in a contract or agreement for the disposition of a lot, parcel, unit or interest in a planned real estate development ...:
9. A clause or provision providing that a closing date may be delayed due to circumstances involving weather, strikes, lockouts or other labor disputes involving the developer or the suppliers, delays in the issuance of permits or inspections, or any other similar reasons unless there is a time limit placed on the permissible delay after which the purchaser may terminate the contract without penalty. [N.J.A.C. 5:26-6.5(a)9; emphasis supplied].
Paragraph 12 does place a time limit on permissible delay due to unforeseen circumstances, giving the seller that right to postpone the closing date within certain time limits. However, Paragraph 12 is silent as to the right of either party to cancel the contract. From the language of the regulations, it is clear that the limitations and restrictions on the use of such clauses are intended to protect purchasers, and to prevent sellers from benefiting by delays. More importantly, Paragraph 12 is entitled "Default of Seller" and deals with the inability or refusal of the seller to perform. We find no language in Paragraph 12 which may be reasonably interpreted to give the seller the right to cancel the contract.
In Melcer v. Zuck, 101 N.J. Super. 577 (App.Div.), certif. den. 52 N.J. 498 (1968), sellers were held to be obligated only to *131 return buyer's deposit and search fees due to a contract provision which provided that in the event title was unmarketable, "the only obligation of the seller shall be the return of the deposit and all moneys of the purchaser unto the seller, plus search fees not to exceed $150." Id. at 585. Title was unmarketable because there was no proof that an easement had been established over any of the properties through which the means of ingress and egress were located. Id. at 583. We noted, however, that plaintiffs were not barred from seeking specific performance without an abatement. Id. at 585.
The purchasers here did not invoke Paragraph 12. They were willing to wait out the delay. It would be inequitable to allow seller to "benefit" from the delay by canceling the contracts, returning the deposit money and then reselling the same unit at a higher price. We find no evidence that the parties intended such a result. While defendant-seller may in some circumstances be protected from further liability, we cannot accede to a result which would deny plaintiffs-purchasers the benefit of their bargain, i.e., the amount of equity they would have gained in their units but for the seller's delay. If the language of Paragraph 12 is ambiguous, it must be construed against the drafter of the agreement, which in this case is the seller. See In re Miller, 90 N.J. 210, 221 (1982). The result urged by defendants is unfair and far from the reasonable expectation of the public. In the absence of explicit notice of such a consequence, Paragraph 12 should not be so interpreted.
We conclude that Paragraph 12 does not have any effect on plaintiffs' right to seek specific performance of their contracts in these circumstances. Further, specific performance is required in order to afford plaintiffs a just and complete remedy.
Plaintiffs' claims for specific performance were severed from their claims for damages. The trial judge determined that plaintiffs' sole remedy was the return of deposit monies, exclusive of all other relief. Plaintiffs did not have an opportunity to *132 present their legal claims for damages, consumer fraud and violations of PREDFDA provisions. We express no opinion on the viability of these claims and leave the resolutions of those issues to the trial court.
We reverse and remand for the entry of appropriate orders for specific performance and disposition of the severed damage claims.