244 N.J. Super. 104 (1990)
581 A.2d 893
FRIENDSHIP MANOR, INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT/CROSS-APPELLANT,
v.
MURRAY GREIMAN, INDIVIDUALLY AND TRADING AS GREY REALTY CO., AND LENORE GREIMAN, HIS WIFE, DEFENDANTS/THIRD-PARTY PLAINTIFFS/APPELLANTS/CROSS-RESPONDENTS,
v.
GARDEN STATE BANK, A CORPORATION OF NEW JERSEY, THIRD-PARTY DEFENDANT/RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 1990.
Decided October 22, 1990.
*105 Before Judges PRESSLER, BAIME and DiMARTINO.
*106 Joseph Gordon argued the cause for defendants/third-party plaintiffs/appellants/cross-respondents (Gordon and Kanengiser, attorneys; Joseph Gordon of counsel and on the brief).
William J. Hill argued the cause for plaintiff-respondent/cross-appellant.
James P. Brady argued the cause for third-party defendant/respondent (Novins, York, DeVincens & Pentony, attorneys; James P. Brady on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Plaintiff Friendship Manor, Inc. (Friendship) brought this specific performance action to compel defendant Murray Greiman, individually and trading as Grey Realty Co. (Greiman), to convey to it, free and clear of any encumbrances, a parcel of vacant land in Jackson Township which Greiman had contracted to sell to it for $75,000. More specifically, plaintiff seeks to have Greiman satisfy two mortgages given to Garden State Bank by his own grantor, Bee Tree Corporation, a corporation then wholly owned by one Stephen Sigler, not a party to this action.[1] Greiman, taking the position that the mortgages are void and unenforceable as to his chain of title because of their late recording, filed a third-party complaint against Garden State demanding a judgment so declaring. Following a bench trial in the Law Division, the court concluded that the mortgages were a valid lien upon the premises. It declined, however, in its discretion, to grant plaintiff specific performance, awarding it instead damages for breach of Greiman's contractual undertaking to convey good title. Greiman appeals from those provisions of the ensuing judgment validating the mortgages and awarding plaintiff damages. Plaintiff cross appeals from *107 that portion of the judgment denying it the remedy of specific performance. We agree with the trial judge's holding that the mortgages constitute an enforceable lien on the premises. We are, however, satisfied that it erred in withholding specific performance relief.
Dispositive of the issues before us is the proper application to the facts, both undisputed and as found by the trial judge, of the so-called race notice statute, N.J.S.A. 46:22-1, which provides in full as follows:
Every deed or instrument of the nature or description set forth in section 46:16-1 of this title shall, until duly recorded or lodged for record in the office of the county recording officer in which the affected real estate or other property is situate, be void and of no effect against subsequent judgment creditors without notice, and against all subsequent bona fide purchasers and mortgagees for valuable consideration, not having notice thereof, whose deed shall have been first duly recorded or whose mortgage shall have been first duly recorded or registered; but any such deed or instrument shall be valid and operative, although not recorded, except as against such subsequent judgment creditors, purchasers and mortgagees.
The critical inquiry here is whether Greiman, when he recorded his deed from Sigler, had notice of the later executed but prior recorded mortgages from Bee Tree to the bank. The trial judge found that Greiman did not have actual notice, and since the record adequately supports that finding, we are obliged to defer to it. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484, 323 A.2d 495 (1974). It is, however, well settled that constructive notice of an existing encumbrance  that is, chargeable notice beyond actual knowledge and record notice pursuant to N.J.S.A. 46:21-1  will also defeat a claimant's right to rely on the protections otherwise afforded by the race notice statute. Scult v. Bergen Valley Builders, Inc., 76 N.J. Super. 124, 135, 183 A.2d 865 (Ch.Div. 1962), aff'd 82 N.J. Super. 378, 197 A.2d 704 (App.Div. 1964). See also Palamarg Realty Company v. Rehac, 80 N.J. 446, 404 A.2d 21 (1979); Gutermuth v. Rapiecki, 159 N.J. Super. 139, 148, 387 A.2d 385 (Ch.Div. 1977); Michalski v. United States, 49 N.J. Super. 104, 108-109, 139 A.2d 324 (Ch.Div. 1958).
*108 In the context of the race notice statute, constructive notice arises from the obligation of a claimant of a property interest to make reasonable and diligent inquiry as to existing claims or rights in and to real estate. Scult, supra, 76 N.J. Super. at 135, 183 A.2d 865. Accordingly, as Justice (then Judge) Pashman there held, the claimant will be charged with knowledge of whatever such an inquiry would uncover where facts are brought to his attention, "sufficient to apprise him of the existence of an outstanding title or claim, or the surrounding circumstances are suspicious and the party purposefully or knowingly avoids further inquiry." Id. (Emphasis the court's.) We are satisfied that both plaintiff and Garden State conclusively established Greiman's constructive notice, as so defined, of Bee Tree's prior recorded mortgages to the bank at the time he recorded his own deed from Bee Tree.
The history of the Bee Tree-Greiman chain of title has its genesis in the sad and simple fact that Sigler was not an honest man. Greiman is an attorney-at-law of this state who represented Hartford Accident and Indemnity Co. Hartford indemnified the First National Bank of Toms River against the risk of improperly honoring customers' checks. Sigler, a customer of that bank, fraudulently obtained $38,000 from it by "kiting" checks. Hartford paid the bank's loss and instructed Greiman to commence an action against Sigler to recover its payment. The suit, which Greiman commenced in late 1969 or early 1970, was concluded in April 1971 by Sigler's execution in Hartford's favor of a promissory note in the amount of the debt, an arrangement apparently satisfactory to Hartford because of Sigler's representation that he owned sufficient property in Ocean County to cover the obligation.
Sigler, by his corporation, Bee Tree, acquired the premises in question in 1976, and in the following year gave Hartford a replacement note which included interest on the original principal sum. Several months later, in October 1977, Sigler told Greiman that he was in danger of losing the property to a sheriff's sale. Sigler, we gather, exerted the successful conman's *109 charm and plausibility to which Greiman succumbed. He lent Sigler $2,986 to avert the sheriff's sale and in October 1977 took back, apparently as collateral for the loan, Bee Tree's deed conveying the property to him. Greiman did not, however, then record the deed. In 1979, Greiman and Sigler entered into an agreement, also not recorded, whereby they agreed that on sale of the property, the proceeds would first be used to pay Sigler's still outstanding debt to Hartford and that Sigler and Greiman would equally share the balance. For the evident purpose of protecting the consequent rights of his client Hartford as well as his own since neither the Bee-Tree/Greiman deed nor the Greiman/Sigler contract had been recorded, Greiman requested and obtained from Sigler possession of the Bee Tree stock certificates and its corporate kit, including the corporate seal  a rather illusory assurance against Sigler's known penchant for fraudulent dealing. In any event, it was not long before Sigler managed to reacquire the seal from Greiman by representing to him that Bee Tree had to execute a drainage ditch easement in favor of Ocean County.
With a record-clear title to the premises and rearmed with the corporate seal, Sigler, in August 1981, negotiated a mortgage loan with the Garden State Bank. He executed a mortgage from Bee Tree to the bank on August 7. Obviously relying on the lapse of time between delivery of a recordable instrument to the obligee and its actual recording, Sigler, on August 14, 1981, executed a deed from Bee Tree conveying the premises to another of his wholly-owned corporations, East of Mill Dam (Mill Dam), and took the precaution of attending to its recording on the same day. The bank, in the meantime, had failed to protect itself by the filing of a notice of settlement pursuant to N.J.S.A. 46:16A-1. Its mortgage from Bee Tree was recorded in due course on August 17, 1981, three days after the recording of the deed out of Bee Tree and into Mill Dam. In December 1981, the bank not yet having learned of Sigler's duplicity and itself failing to search the record, lent Sigler an additional sum, accepting a second mortgage from Bee Tree, *110 also recorded in due course. Not long thereafter, the bank finally learned that its mortgages had not been recorded until after Bee Tree's divestiture of title. Although its complaint to the Ocean County Prosecutor respecting Sigler's apparent fraud suggests its understanding that the Bee Tree/Mill Dam deed might well be voidable, it sought no judicial declaration to that effect, contenting itself with an action against Bee Tree and Sigler on the combined mortgage debt and recovering judgment in 1982 against them in that amount.
Greiman, the trial court found, had no contemporaneous knowledge of the Mill Dam deed and the Garden State Bank mortgages. He continued to enjoy amicable relations with Sigler until the summer of 1984, when, as he testified, he and Sigler had "some difference that irritated me" and Sigler "breached my faith," causing Greiman to become sufficiently suspicious to search the Ocean County grantor index. On July 27 of that year he found the Bee Tree/Mill Dam deed, but did no further searching out of either Bee Tree or Mill Dam, consequently locating neither of the after-recorded Garden State mortgages. Greiman's prompt inquiry of the Secretary of State's Office disclosed to him Sigler's ownership of Mill Dam and, consequently, Sigler's fraud. Greiman also then inquired of the municipal tax collector and discovered that the property was on the tax sale foreclosure list. He attempted to redeem but was not permitted to do so because he had no record interest. Consequently, in October 1984, he finally recorded his 1977 deed from Bee Tree and, still meeting municipal resistances to his redemption, he instituted an action in the Law Division in January 1985 seeking both an adjudication of his right to redeem and the nullification of the Bee Tree/Mill Dam deed. That relief was accorded by a judgment entered on October 21, 1985, which also directed the Ocean County Clerk to record the judgment indexed under Mill Dam as grantor and Greiman as grantee and to make a margin reference thereof on the deed-book page on which the Bee Tree/Mill Dam deed was recorded.
*111 Relying on his 1977 deed which was recorded in 1984 and on his 1985 judgment, Greiman, without any further search of the record, contracted with plaintiff for the sale of the land in September 1986. Needless to say, plaintiff's search, guided by the margin notation required by Greiman's 1985 judgment, turned up the two prior recorded Garden State mortgages and its subsequent judgment. Plaintiff demanded that these obligations be assumed by Greiman, making clear to Greiman its readiness and ability to close title on that condition. Greiman claimed that the mortgages and the judgment were void as to him and insisted that plaintiff close title irrespective of the state of the record. This litigation ensued.
We address first the validity of Garden State's mortgages as against Greiman. Greiman's position is simple. He claims that as a consequence of N.J.S.A. 46:21-1 and 46:22-1, read in pari materia, a prospective purchaser is not required to search the records for transactions by any owner in the chain of title either before the recorded deed into that owner or after the recorded deed out of that owner. That is a generally correct proposition. See, e.g., Palamarg Realty Company v. Rehac, supra; Garden of Mem., Inc. v. Forest Lawn Mem. Pk. Assn., 109 N.J. Super. 523, 264 A.2d 82 (App.Div.) certif. den. 56 N.J. 476, 267 A.2d 58 (1970); Sec. Pac. Fin. Corp. v. Taylor, 193 N.J. Super. 434, 474 A.2d 1096 (Ch.Div. 1984). It follows from that proposition that a bona fide grantee or mortgagee of Mill Dam who had acquired its interest prior to October 1985 for a valuable consideration and without notice of Mill Dam's fraudulent title would have been protected under the recording statutes from the lien of Garden State's mortgages from Bee Tree since a search of the records would not have revealed those mortgages during Bee Tree's prior tenure in title.
But it does not follow that a direct grantee of Bee Tree who recorded after the recording of the Mill Dam deed would be similarly protected. Obviously, a direct grantee searching the records after the 1985 Mill Dam margin notation would have *112 been placed on notice that the Bee Tree/Mill Dam deed was a fraud and a nullity. That consequence would have obliged him to continue to search out of Bee Tree beyond the date of the Mill Dam Deed and at least up to the date of Greiman's judgment. That search would, of course, have revealed the intervening recording of Garden State's mortgages from Bee Tree. Greiman, it is true, recorded his deed as a direct grantee of Bee Tree prior to the margin notation. But by his own admission, he recorded after he had actual record notice of the Mill Dam deed and at least constructive notice of its fraudulent nature and consequent voidability. His position can hardly be superior to that of a stranger to the title having record notice of the fraud.
There are, of course, a host of other circumstances which placed upon Greiman the obligation to inquire as to Bee Tree's recorded transactions after the date of the Mill Dam deed. Greiman knew from the outset of his dealings with Sigler that Sigler could not be mistaken for an honorable man. He obtained the Bee Tree deed not for full value but as security for a relatively small loan. He chose for more than seven years not to record the Bee Tree deed, foregoing the best protection he and the rest of the world could have had against Sigler's predictable machinations. It was Greiman who replaced the corporate seal in Sigler's hands, thereby contributing to the eventual fraud. Moreover, Greiman was an experienced lawyer. When he found the Mill Dam deed, executed and recorded on the same day, and learned that it was, in effect, a deed from Sigler to Sigler, he must surely have understood that Sigler had rushed to create a new chain of title for some less than licit purpose. Accordingly, those facts alone placed upon him the obligation to inquire from the record just what Sigler's easily discernable purpose was.
In short, Garden State Bank was not blameless. Nevertheless, it recorded its mortgages before Greiman did and had it then searched the records as it should have, Greiman's interest would not have appeared. On the other hand, had Greiman, *113 before recording his own deed, searched the records in compliance with the obligation of inquiry imposed upon him by the facts he knew, he would have found the recorded mortgages. We have been cautioned that "absent any unusual equity" the stability of titles and conveyancing requires the judiciary to follow that course "that will best support and maintain the integrity of the recording system." Palamarg Realty Company v. Rehac, supra, 80 N.J. at 453, 404 A.2d 21. We are convinced that the validation of the prior recorded Garden State mortgages as against the Greiman chain of title is the only result that is consistent with this principle.
We consider now the question of whether the trial judge erred in declining to grant plaintiff a specific performance remedy. There is a virtual presumption, because of the uniqueness of land and the consequent inadequacy of monetary damages, that specific performance is the buyer's appropriate remedy for the vendor's breach of the contract to convey. See generally Centex Home Corp. v. Boag, 128 N.J. Super. 385, 389, 320 A.2d 194 (Ch.Div. 1974). Nevertheless it is also clear that specific performance is a discretionary remedy resting on equitable principles and requiring the court to appraise the respective conduct and situation of the parties. Thus, as Justice Francis explained in Stehr v. Sawyer, 40 N.J. 352, 357, 192 A.2d 569 (1963):
[T]he party asking the aid of the court must stand in conscientious relation to his adversary; his conduct in the matter must have been fair, just and equitable, not sharp or aiming at unfair advantage. The relief itself must not be harsh or oppressive. In short, it must be very plain that his claim is an equitable one.
See also Barry M. Dechtman, Inc. v. Sidpaul Corp., 89 N.J. 547, 551, 446 A.2d 518 (1982).
Applying these principles here, we are satisfied that the grant of the remedy was mistakenly withheld. It is clear that plaintiff was entirely blameless in its own transactional conduct and expectations. There is no reason to deprive it of the benefit of its bargain, that is, conveyance of the property for *114 the stated price.[2] Greiman, on the other hand, while he may have had no actual knowledge of the Garden State mortgages, is in substantial measure actually responsible, even if not morally so, for the events which transpired after the execution of the Bee Tree deed to him. Nor do we perceive, on this record, any oppressive hardship in requiring him to satisfy the mortgages out of plaintiff's purchase price.
The trial judge apparently withheld specific performance because of his finding that Greiman had no actual knowledge of the bank lien and therefore did not have the opportunity to take it into account in fixing the price. Thus he concluded that specific performance would unduly burden Greiman. We, however, are unable to perceive any substantial difference between encumbering Greiman's title with the lien of the mortgages, as the judge directed, and requiring him to satisfy the mortgages out of plaintiff's purchase money, which was never demonstrated to be other than fair market value. We see no evidential basis for an undue oppression conclusion. As to Greiman's knowledge, we point out that the facts as found by the trial judge compelled charging Greiman with notice as a matter of law. Moreover, the court's validation of the mortgage as against Greiman necessarily rested upon the conclusion that Greiman had constructive notice thereof. In these circumstances, we cannot conclude that he had such notice for one purpose and not for another. In short, we are satisfied that the denial of the specific remedy here resulted from a misapplication to the factual complex of controlling equitable principle. See Wolosoff v. CSI Lighting Trust, 205 N.J. Super. 349, 363, 500 A.2d 1076 (App.Div. 1985).
That portion of the judgment validating the liens of third-party defendant Garden State Bank is affirmed. That portion of the judgment awarding monetary damages in lieu of specific *115 performance is reversed, and we remand to the trial court for entry of a modified judgment directing specific performance.
NOTES
[1] In addition to the mortgages of record there is also a later judgment in favor of the bank against Bee Tree in the amount of the total mortgage debt entered in the bank's collection action against its mortgagor.
[2] Indeed plaintiff had indicated a willingness to accept, without price abatement, a somewhat smaller quantum than contracted.