This is a bill for specific performance of a contract for the sale of land. The complainant is the vendee and the *Page 765 
defendant the vendor. The contract is dated May 9th, 1925, and provides for the sale by the defendant to the complainant of certain lands in the city of Long Branch for the consideration of $50,000, $5,000 of which was paid on the execution of the contract and the balance was to be paid $20,000 in cash at the settlement and $25,000 by the execution and delivery of a purchase-money mortgage in that amount. Under the terms of the contract settlement was fixed for May 25th, 1925. Time was not, in so many words, made of the essence of the contract, but it is apparent from the dealings between the parties that prompt action was intended. The complainant was represented by a Mr. Baron, a New York attorney, who prepared the form of contract, and defendant is himself a lawyer, so that the parties dealt "at arm's length." The day of settlement fixed by the contract was postponed by written stipulation to June 1st, to June 15th, and finally to June 22d 1925. The last stipulation is dated June 11th.
On June 20th, Baron, Reade's attorney, applied to McKenna for a further extension, which was refused. Baron's version of what occurred at that time is as follows:
"He said that in view of the fact that these objections were outstanding that he wouldn't enter into a formal stipulation fixing a date, but he would co-operate with the title company and then he would fix a date, and I let it go at that until June 22d, when I made another attempt through a representative of my office to get a formal stipulation."
The defendant's version of what took place between him and Baron is as follows:
"Mr. Baron asked me if I would give another extension, that he had to go away, and I told him no, I would not. I said that `at the last extension you said you wouldn't ask for any more and we at that time both agreed that that should be the last extension.' He said, `Yes, I know it, but I have got to go to Cleveland' — or Cincinnati or some place — and he said, `I would like to have another extension as a personal favor.' I said, `I can't grant it as a personal favor. This contract was closed with me at this reduced price upon *Page 766 
Mr. Reade's statement that I would be paid in cash the full amount, and that later the cash was cut in half to $25,000,' and I said, `I have explained to you several times that I am losing valuable opportunities for investment of this money, and that I will not grant any further adjournments.' Mr. Baron said, `Well,' he said, `McKenna, I don't think it makes any difference.' He says, `Mr. * * * I am sure Mr. Reade can buy the property from you later at a reduced price. You have held it for over thirty years, and you weren't able to sell it.' I said, `Be that as it may, I won't grant any further extensions. You can send somebody else down to close the title; you don't have to be here.'"
Baron was in court when this testimony of the defendant was given, and did not take the stand in rebuttal, and made no denial of this testimony except as made in his direct testimony above quoted.
I am inclined to believe Mr. McKenna's version of what took place at the meeting on June 20th, as it seems to be corroborated by the later acts of the parties and their representatives. On June 22d a Mr. Joseph, of Mr. Baron's office, went to Mr. McKenna with a proposed written stipulation extending the time for settlement to a definite date, but Mr. McKenna refused to sign it. Joseph says that nothing else occurred on that occasion except that he requested McKenna to sign the stipulation, and McKenna refused; but McKenna says he first inquired of Joseph if he represented Mr. Baron, and on receiving an affirmative reply, tendered to Mr. Joseph a deed for the property, which was the subject of the sale, which Mr. Joseph refused, and that he, McKenna, then made a note of this tender on the papers. The note referred to appears on one of the exhibits. Joseph denies that any tender was made, but I am unable to accept that denial, as it is undisputed that on July 10th Baron saw McKenna and asked to be shown the papers tendered to Joseph. If Joseph spoke the truth, why did Baron ask to inspect the papers? Baron did not deny that such a request had been made by him, and if McKenna had said, as Baron claims, that they *Page 767 
would hold the matter of settlement in abeyance without day until the title objections had been cleared up, why was there any necessity for sending Joseph to McKenna on June 22d? Baron left for Europe on July 25th and did not return until late in August. During his absence the complainant was represented by his solicitors of record, but it is admitted that neither the complainant nor any of his attorneys communicated with defendant in any way between June 22d and August 18th, except for the call of Baron on McKenna on July 10th, when he asked to be shown the papers which had been tendered to Joseph. In the meantime, the defendant, assuming that the complainant had abandoned the contract, listed his property for sale with various real estate agencies. About August 10th, 1925, a real estate boom struck Long Branch and vicinity, and the value of the property in question went up from $50,000 to $100,000 or $125,000. Complainant alleges this as the reason for McKenna's refusal to perform while McKenna counters with the charge that this is the defendant's excuse for attempting to revive the abandoned contract. Complainant alleges numerous defects in defendant's title as the cause of the delay. It appears that the parties had been negotiating with reference to this property for some weeks before the contract was eventually signed, and that Baron had had an examination of the title made prior to the preparation of the contract in order to determine whether or not McKenna was the record owner. The abstract submitted by the title company on this application was offered in evidence and it appears to be practically complete. Later, however, a more complete search and abstract was made, the final report on which reached Baron early in June. If time was not, in so many words, made of the essence of this contract, as originally prepared, the circumstances are strong that time was intended to be of the essence, and this is evidenced by the short settlement date fixed in the contract and the three short adjournments.
In Orange Society v. Konski, 94 N.J. Eq. 632 (at p. 633), Vice-Chancellor Backes said: *Page 768 
"The law is that a day fixed in a contract for closing title, without more, is merely formal; but if it is stipulated that time is of the essence, or the circumstances are persuasive that that is the case, prompt performance is essential, and it is also the law that where the time fixed is regarded as a formality only, and the period has gone by, or where time is of the essence and there is a waiver, that time may nevertheless be made of the essence by formal demand that the title be closed by a given day; but the time given must be reasonable."
But it is unnecessary for me to decide here whether or not time was originally of the essence (and as I have already said, the circumstances indicating this are strong), because I think that both parties intended to make time of the essence when the last extension to June 22d was given. If I accept McKenna's statement as to what occurred on June 11th when this extension was arranged (and I have already indicated that I do accept that statement), it was then understood by both McKenna and Reade that no further extension was to be granted and it was not as a matter of right, but as a personal favor, that Baron later asked for a further extension which was refused. In my judgment time was then made of the essence if it had not been so before, and the only question now is whether or not the time then fixed as the final date for closing was, under the circumstances, reasonable. The only matter suggested by complainant requiring additional time was the clearing up of title objections and defects. Obviously, no time was required by the complainant for this purpose because it was not complainant's business to clear up these objections or to remedy the defects. That was the defendant's job. It is therefore pertinent to inquire what were the title objections required to be removed. First, outstanding certificates of tax sale, most, if not all of which McKenna had in his possession ready for cancellation at settlement; (2) the $12,000 mortgage, unacknowledged and unrecorded satisfaction piece for which McKenna had, and exhibited to Baron; (3) outstanding Herbert interest, if any. As to this it may be said that McKenna had a policy *Page 769 
of title insurance from the Fidelity Trust Company of Newark, guaranteeing perfect title in him and on which he had a right to rely. Further than this, he had been in peaceable possession of the property for over thirty years; (4) discrepancies in property lines which complainant himself says were of no considerable importance. But McKenna's testimony was that he told Baron that if any of the title objections were not satisfactorily cleared up at the settlement, sufficient of the purchase price might be withheld at settlement to cover all the uncanceled items, if necessary. This was a practical solution of the difficulties, if any existed. But I am not convinced, nor am I called upon here to decide, that there is any outstanding so-called "Herbert interest" in this property. The evidence on this point is merely that one title examiner, representing a responsible title company, out of an abundance of caution, perhaps, set up this question of outstanding interest as one of the things to be disposed of on settlement; but as against this we have the fact that another equally responsible title company has already guaranteed the defendant's title. Under these circumstances, and coupled with the fact that an examination of this title had been made at Baron's request prior to the execution of the contract, report of which he had in his possession at the time, the time fixed for final closing was reasonable. The instant case is similar to that of Barry v. Ruskin, 99 N.J. Eq. 730, recently decided by me, where I held that time not originally of the essence of the contract had been subsequently made of the essence by agreement of the parties. In the instant case it is apparent that there was a complete agreement between Baron and the defendant on June 11th that June 22d was to be the final date.
The complainant himself had very little to do with the negotiations with respect to this contract. Correspondence and other exhibits, together with the testimony of the architect, are persuasive that complainant did not understand that the contract had been abandoned; but Baron admittedly acted for the complainant and with his full authority. It *Page 770 
may be that Baron thought he was taking no chances, and that Reade could buy the property later at a less price, as McKenna said Baron declared. If Baron was gambling he was playing with Reade's chips, and Reade must stand Baron's losses. Both sides lay considerable stress in the argument on the letter of August 18th, 1925, addressed by complainant's solicitor to the defendant, but this letter, as I view it, is an attempt to restore a lost cause. Considerable space is also taken up in complainant's brief by the argument respecting defendant's credibility as a witness. It is unnecessary for me to make any comment on this point except to say that there is ample corroboration of defendant's testimony with respect to the vital points in this case to warrant its belief. I shall, therefore, advise a decree dismissing the bill of complaint, but as defendant has offered to return to complainant the $5,000 deposited on the execution of the contract, the decree will so provide.