866 A.2d 208 (2005)
374 N.J. Super. 588
Joseph MARIONI, Plaintiff-Appellant,
v.
94 BROADWAY, INC., a New Jersey corporation and John Lindner, Defendants-Respondents, and
Roxy Garments Delivery Co., Inc., a/k/a Roxy Garment Delivery Co., Inc., a New Jersey corporation, Bert Miller, Joel Heier, John J. Cummings, Anthony J. Davis, and Cummings & Davis, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 2004.
Decided February 8, 2005.
*212 John J. Curley argued the cause for appellant (John J. Curley, LLC, attorneys; Mr. Curley, of counsel; Jennifer J. Bogdanski, on the brief).
James P. Rhatican, Roseland, argued the cause for respondents (Connell Foley, LLP, attorneys; Francis E. Schiller, of counsel; Mr. Rhatican and Susan L. Christie, on the brief).
Before Judges WEFING, FALL and C.S. FISHER.
*209 The opinion of the court was delivered by
FISHER, J.A.D.
By way of this action, plaintiff Joseph Marioni sought specific performance of his contract to purchase property from defendant Roxy Garment Delivery Co., Inc. (Roxy). We agree with his argument that the Chancery judge erred in granting summary judgment dismissing his equitable claims (1) because of questions of fact concerning the propriety of Roxy's attempt to set a time of the essence closing date, (2) because, in contracting with and conveying to another, Roxy could not legitimately believe that plaintiff had forfeited his contractual rights by failing to appear for closing when Roxy had stated its refusal to fully perform its own contractual obligations, and (3) because Roxy waived its right to insist upon plaintiff's performance at the purported time of the essence closing by subsequently agreeing to a new closing date. We also conclude that plaintiff's right to specific performance was not precluded by the fact that Roxy conveyed the property to another in the interim because the subsequent purchaser had actual and constructive notice of plaintiff's contract with Roxy and, thus, could not legitimately claim the status of bona fide purchaser. We remand for further proceedings in conformity with this opinion.

I
On August 21, 1998, plaintiff entered into a contract to purchase property in Jersey City from Roxy for $170,000. The contract required that, at the time of closing, the property be vacant. Due to considerable problems encountered by Roxy in evicting its tenant, Roxy was in no position to close for approximately two years.[1]
In October 2000, after the tenant had been removed, the attorneys for the contracting *213 parties discussed the property's condition and the fact that it contained extensive amounts of debris. Despite the contract's requirement that the property be turned over, at closing, in "broom clean" condition, Roxy announced the following in its attorney's letter of October 24, 2000:
My client has requested that I restate his position again. The property is available "as is." Your client contracted to buy this property at a very fair price over three years ago. My client spent thousands of dollars and a great deal of his time in obtaining possession of the property since that time. He is not willing to do anything else to bring this matter to a close.
Time is hereby made of the essence for a closing on November 7, 2000. Should your client fail to take title on that date, we will take all appropriate action.
A week later, plaintiff's attorney reiterated his client's position that Roxy was obligated to turnover the property at closing with all debris removed.
On November 17, 2000, Roxy's attorney returned plaintiff's $12,000 deposit, advising that he was so instructed because Roxy believed that plaintiff "breached the contract by failing to close title pursuant to a notice to do so." In reply, on November 21, 2000, plaintiff's attorney sent back the $12,000 check, again explaining plaintiff's position that the contract required that the property be turned over in broom clean condition; at the same time, plaintiff offered to avoid any resulting litigation by agreeing to a $12,500 escrow for the cleanup of the property.
Later correspondence between these attorneys memorialized the parties' agreement to resolve the dilemma posed by Roxy's unwillingness to abide by the terms of the contract. The parties agreed that the closing would occur on January 3, 2001 and that Roxy would provide a credit of $12,500 for the clean-up of the property. This agreement was confirmed by plaintiff's counsel on December 1, 2000 and, also, by Roxy's attorney on December 13, 2000. On December 13, 2000, plaintiff recorded a notice of settlement with the county clerk.
What was then unknown to plaintiff was that Roxy, through a different attorney, was negotiating to sell the property to defendant John Lindner. On November 21, 2000, defendant Joel Heier, a Roxy officer, met with Lindner. Heier provided Lindner with a copy of plaintiff's contract with Roxy as well as a copy of his attorney's November 17, 2000 letter to plaintiff returning the deposit.[2] Heier and Lindner reached an agreement and, on December 8, 2000  one week after plaintiff and Roxy had agreed to an escrow for the removal of the debris and a new closing date  Roxy executed a contract to sell the property to defendant 94 Broadway, Inc. (94 Broadway), a corporation controlled by Lindner. Lindner recorded a notice of settlement on December 11, 2000, two days prior to the recording of a similar document by plaintiff.
Also then unknown to plaintiff, a closing between Roxy and 94 Broadway took place on December 18, 2000, and a deed of conveyance was recorded the next day. Plaintiff learned this when he appeared for the January 3, 2001 closing that his attorney and Roxy's attorney had agreed upon.
*214 On January 11, 2001, plaintiff filed a verified complaint in the Chancery Division against Roxy, two of Roxy's officers (Heier and Bert Miller), 94 Broadway, Linder, and Roxy's attorneys. Plaintiff sought, among other things, specific performance of his agreement with Roxy. On January 18, 2001, the Chancery judge entered an order that restrained 94 Broadway and Lindner (hereafter collectively referred to as Lindner) from making any structural changes to the building, from leasing any portion of the building, and from alienating or transferring ownership of the property, pending further order. Lindner and Roxy soon moved to dismiss the complaint, and plaintiff cross-moved for specific performance. The Chancery judge ruled that plaintiff was not entitled to specific performance and, in an order entered on May 29, 2001, dismissed that part of the complaint that sought equitable relief, dissolved the temporary restraints, and transferred the remaining claims to the Law Division. A subsequent motion for reconsideration was denied on August 3, 2001, and plaintiff's motion for leave to appeal was denied by this court.
Approximately two years later, an order was entered in the Law Division that resolved the remaining claims, thus rendering the interlocutory orders of May 29, 2001 and August 3, 2001 final and appealable. Plaintiff filed a timely notice of appeal seeking our review of those orders.
Plaintiff correctly recognized that his entitlement to specific performance initially turned on the status of his contract with Roxy at the time when Roxy contracted with Linder. Plaintiff claims that his contract with Roxy had never been terminated, that Roxy's attempts to terminate the contract in November 2000 were wrongful, and that Roxy's attempt to set a time of the essence closing that plaintiff refused to appear for were inconsequential. As a result, plaintiff claimed that his contractual rights remained intact throughout and that the subsequent Lindner-Roxy contract could not eviscerate his equitable rights because Lindner was not a bona fide purchaser.
In light of these contentions, plaintiff's right to specific performance must be analyzed in two stages. The first stage relates to his contract relationship with Roxy and the events that caused Roxy to believe, incorrectly, that plaintiff had breached the contract by failing to appear for a closing on November 7, 2000. The second stage relates to the question of whether Roxy was entitled, when the plaintiff-Roxy contract did not close on November 7, 2000, to contract with Lindner, and whether Lindner was a bona fide purchaser whose rights were superior to plaintiff's.

II
Before considering the practical effect of the events and circumstances revealed by the record on appeal, we first make the following observations about the remedy of specific performance that illuminate the way.
In general, to establish a right to the remedy of specific performance, a plaintiff must demonstrate that the contract in question is valid and enforceable at law, Jackson v. Manasquan Sav. Bank, 271 N.J.Super. 136, 144 n. 8, 638 A.2d 165 (Law Div.1993); 25 Williston, Contracts (Lord ed., 2002), § 67:2 at 186,[3] that the *215 terms of the contract are "expressed in such fashion that the court can determine, with reasonable certainty, the duties of each party and the conditions under which performance is due," Salvatore v. Trace, 109 N.J.Super. 83, 90, 262 A.2d 409 (App.Div.1969), aff'd o.b., 55 N.J. 362, 262 A.2d 385 (1970); accord Barry M. Dechtman, Inc. v. Sidpaul Corp., 89 N.J. 547, 552, 446 A.2d 518 (1982),[4] and that an order compelling performance of the contract will not be "harsh or oppressive," Stehr v. Sawyer, 40 N.J. 352, 357, 192 A.2d 569 (1963); Ridge Chevrolet-Oldsmobile, Inc. v. Scarano, 238 N.J.Super. 149, 155, 569 A.2d 296 (App.Div.1990).
As these and other related precepts indicate, the right to specific performance turns not only on whether plaintiff has demonstrated a right to legal relief but also whether the performance of the contract represents an equitable result. That is, after determining that the purchaser has a legal right to recovery, a court of equity must make a further determination that has been said to be discretionary. See, e.g., Friendship Manor, Inc. v. Greiman, 244 N.J.Super. 104, 113, 581 A.2d 893 (App.Div.1990) (specific performance is a "discretionary remedy resting on equitable principles"), certif. denied, 126 N.J. 321, 598 A.2d 881 (1991). As explained by Professor Pomeroy:
The right to an equitable remedy ... is never in this sense absolute, and may, therefore, when compared with the legal right, properly and to a limited extent, be called discretionary. That is, in addition to the facts, events, and relations which give rise to the certain and absolute legal right, there may be other facts, circumstances, and incidents which determine the existence of the equitable right, which modify its application, or, perhaps, entirely prevent its exercise. The phrase "within the discretion of the court," is, therefore, employed to contrast the equitable with the legal remedy; within the domain of equity jurisdiction remedies are not, in any true sense, discretionary, but are governed by the established principles and rules which constitute the body of equity jurisprudence.
[Pomeroy, Specific Performance of Contracts (3d ed., 1926), § 37 at 115-16.]
For these reasons, when specific performance is sought, the court is required to do more than merely determine whether the contract is valid and enforceable; the court of equity must also "appraise the respective conduct and situation of the parties," Friendship Manor, supra, 244 N.J.Super. at 113, 581 A.2d 893, the clarity of the agreement itself notwithstanding that it may be legally enforceable, Salvatore, supra, 109 N.J.Super. at 90, 262 A.2d 409, and the impact of an order compelling performance, that is, whether such an order is harsh or oppressive to the defendant, Stehr, supra, 40 N.J. at 357, 192 A.2d 569, or whether a denial of specific performance leaves plaintiff with an adequate remedy, Fleischer v. James Drug Stores, Inc., 1 N.J. 138, 146-47, 62 A.2d 383 (1948).[5]
*216 Also, as a consequence of the remedy's equitable underpinnings, the party seeking specific performance "must stand in conscientious relation to his adversary; his conduct in the matter must have been fair, just and equitable, not sharp or aiming at unfair advantage." Stehr, supra, 40 N.J. at 357, 192 A.2d 569. This weighing of equitable considerations must represent, in each case, a conscious attempt on the part of the court of equity to render complete justice to both parties regarding their contractual relationship. In short, a court of equity will often direct performance of such a contract because, when there is no excuse for the failure to perform, equity regards and treats as done what, in good conscience, ought to be done. Goodell v. Monroe, 87 N.J. Eq. 328, 335, 100 A. 238 (E. & A.1917).
These equitable considerations  that is, how clearly have the parties expressed their contractual undertaking, whether the impact of compelling performance will be unduly oppressive or whether the withholding of the remedy will leave the plaintiff with an inadequate remedy, and whether the parties have acted equitably toward each other, among others  pour content into what is meant by the "discretionary" nature of specific performance. It is not a discretion that depends upon "the mere will and pleasure of the judge; nor does it depend upon his own individual opinion, as to its propriety and feasibility; much less is it a matter of favor." Pomeroy, supra, § 36 at 114. Instead, the court must exercise judicial discretion-a discretion "controlled and governed by the principles and rules of equity." Ibid.

III
We are satisfied from our review of the papers submitted to the Chancery judge that plaintiff had demonstrated, beyond question, that Roxy had wrongfully attempted to terminate its contract with plaintiff and that the contract remained valid and enforceable when Roxy wrongfully contracted with, and conveyed the property to, Lindner.
As the record reflects, plaintiff remained patient while it took Roxy approximately two years to remove a tenant from the premises. Indeed, plaintiff demonstrated his desire to obtain the benefit of his bargain by twice testifying in the tenancy proceedings brought by Roxy against the tenant. When Roxy finally succeeded in obtaining a judgment of possession in June 2000, and soon thereafter secured the tenant's removal from the property, the parties then discussed a closing date. Plaintiff inspected the premises on October 10, 2000,[6] observed a significant accumulation of debris,[7] and, as indicated earlier, reminded Roxy of its obligation to convey the property in "broom clean" condition. Roxy wrongfully asserted that it had no obligation to remove the debris and demanded that plaintiff take the property "as *217 is." Roxy then tried to bully plaintiff into acceding to its inaccurate understanding of the contract by attempting to set "time of the essence" for November 7, 2000. When plaintiff did not then appear, but instead persisted in his correct interpretation of the contract's terms, Roxy asserted that the contract had been breached and returned the deposit. Notwithstanding, further discussions between their attorneys resulted in an escrow agreement concerning the debris on the property and the scheduling of January 3, 2001 as the new closing date. This time plaintiff appeared for closing, but Roxy did not. Plaintiff then learned that the property had been conveyed to Lindner.
In analyzing these events and circumstances, we conclude that (a) there were questions of fact surrounding the legitimacy of Roxy's time of the essence closing date, (b) Roxy could not declare a time of the essence closing while simultaneously stating its refusal to fully perform all its contractual obligations, and (c) Roxy waived any rights it claims to have obtained when plaintiff failed to appear to close on November 7, 2000 by subsequently agreeing to a new closing date.

A
In determining whether a closing date had legitimately been set by Roxy  such that plaintiff's failure to appear and close at that time constituted a forfeiture of his contractual rights  an examination must first be made into whether the contract itself made time of the essence. Paradiso v. Mazejy, 3 N.J. 110, 114, 69 A.2d 15 (1949); Salvatore, supra, 109 N.J.Super. at 91, 262 A.2d 409. While a closing date contained in a contract is often viewed as "formal rather than essential," if the contract itself provides a clear understanding that time is of the essence, then it is well-settled that "prompt performance is essential," Paradiso, supra, 3 N.J. at 115, 69 A.2d 15 (quoting Reade v. McKenna, 99 N.J. Eq. 764, 768, 134 A. 371 (Ch.1926), aff'd, 101 N.J. Eq. 304, 137 A. 918 (E. & A.1927)), and the date contained in the contract for closing will be strictly enforced by a court of equity, Stamato v. Agamie, 24 N.J. 309, 315, 131 A.2d 745 (1957); Salvatore, supra, 109 N.J.Super. at 91, 262 A.2d 409.
There is no dispute that plaintiff's contract with Roxy did not contain a time of the essence closing date.[8] In that circumstance, either party could later make time of the essence. Paradiso, supra, 3 N.J. at 115, 69 A.2d 15. But, in attempting to do so, the contracting party must give reasonable notice of the date for closing, and the date chosen must "bear a reasonable relation to the time already elapsed." Ibid.; Finn v. Glick, 42 N.J.Super. 514, 518-19, 127 A.2d 204 (App.Div.1956); Orange Society v. Konski, 94 N.J. Eq. 632, 636, 121 A. 448(Ch.), aff'd, 95 N.J. Eq. 254, 122 A. 753 (E. & A.1923).
We question, but assume without deciding, that Roxy gave reasonable notice of the November 7, 2000 closing date. The reasonableness of its notice is arguably doubtful since the letter of Roxy's counsel, contrary to normal practice, did not state a time or place for closing. Typically, a valid notice, in this context, would use the phrase "time of the essence" and unequivocally state the date for closing, as here, but it would also state a time and place for closing, terms that are absent from Roxy's notice, or else the other party would not know where or when to arrive for closing. *218 The failure to be as definitive as the notice in, for example, Labash v. Mancini, 14 N.J.Super. 116, 118, 81 A.2d 404 (Ch.Div.1951), has the potential for raising additional questions as to the sufficiency of an attempted performance. See, e.g., Elm Land Co., Inc. v. Glasser, 69 N.J.Super. 290, 297-98, 174 A.2d 233 (App.Div.1961) (time of the essence was set only for March 1, 1961 with no specification of the hour; the court held that plaintiff's conveyance at 5:50 p.m. was reasonable). When a specific time is also included within a valid notice of a time of the essence closing, performance at that precise time will be required and even a minor delay will cause a forfeiture of a party's right to obtain its benefit of the bargain. See Doctorman v. Schroeder, 92 N.J. Eq. 676, 679-80, 114 A. 810 (E. & A.1921) (a delay of 30 minutes in performance was fatal where time was of the essence); Gorrie v. Winters, 214 N.J.Super. 103, 106-07, 518 A.2d 515 (App.Div.1986) (45 minute delay held fatal), certif. denied, 107 N.J. 114, 526 A.2d 184 (1987). Since plaintiff made no attempt to perform at any time on November 7, 2000, the possibility of an application of the Doctorman rule was eliminated, but the absence of detail in Roxy's notice still calls into question its reasonableness and generated sufficient factual uncertainty as to require the denial of defendants' motion for summary judgment.
As to the second aspect  the "reasonable relation" rule described in Paradiso  we conclude there were genuine disputes of material facts as to whether the particular date chosen by Roxy was reasonable under the circumstances and that these factual uncertainties precluded the grant of defendants' motions for summary judgment. The reasonableness of a contracting party's attempt to set a time of the essence closing date must be weighed against the time that had elapsed since the formation of the contract and any deleterious effect that may befall the noticing party as a result of future events beyond the chosen closing date. In other words, the court must assess the delay that preceded the time of essence notice as well as the prejudice to the noticing party by any further delay beyond the date for closing contained in the notice.
Here, in seeking summary judgment, Roxy gave no indication that it would be prejudiced by a reasonable delay beyond the November 7, 2000 closing date it unilaterally chose; indeed, its later willingness to postpone the closing date to January 3, 2001 strongly suggests that a later date would have been equally reasonable. More importantly, the record reflects that approximately two years had elapsed from the execution of the contract until the point in time when Roxy had secured the removal of its holdover tenant and was finally prepared to perform. Considering that extraordinary delay, which occurred through no fault of plaintiff, it is highly questionable whether it was reasonable for Roxy to compel a closing date of November 7, 2000 at the expense of plaintiff's forfeiture of its contract rights for failing to comply.
While we seriously doubt, under these circumstances, whether it was reasonable for Roxy to set November 7, 2000 as a time of the essence closing date without plaintiff's consent, we need not decide that issue since we conclude there is no dispute that Roxy was unwilling, at that time, to perform as it had promised in the contract and that, even if the November 7 closing was reasonably noticed and reasonably fixed, Roxy later waived plaintiff's failure to perform at that time by negotiating a resolution of a dispute about Roxy's performance and by consenting to a new closing date, as we hereafter explain.

*219 B
While it is frequently said that a party seeking specific performance must show that he or she was "ready, desirous, prompt and eager" to perform as required by the contract on the date specified, Stamato v. Agamie, supra, 24 N.J. at 316, 131 A.2d 745, by the same token there is a concomitant obligation on the other party to be ready, willing and able to perform on the date chosen. To seek the forfeiture of the purchaser's equitable title, the seller must act equitably. We conclude that Roxy could not obtain the forfeiture of plaintiff's rights to the contract because it failed to show that it was willing to perform the contract on the time of the essence closing date.
After the removal of the holdover tenant, it was observed by plaintiff that the property contained a considerable amount of debris. Roxy did not dispute plaintiff's contention about the collection of garbage both in the structure and outside on the lot; instead, Roxy simply refused to remove it prior to closing, insisting, through its attorney's October 24, 2000 letter quoted earlier, that the contract did not impose that obligation and that it had already spent thousands of dollars in obtaining possession of the property. Roxy's contention, however, was based on a misunderstanding of its obligations, since paragraph 30 of the contract unequivocally states that the premises would be "left in a broom clean condition."[9] Roxy's argument that this "broom clean" provision is overridden by another provision that states the property was being sold "as is" is mistaken. The common usage of these terms would indicate that the "as is" limitation related only to the structural condition of the building itself  i.e., its floors, walls, roof, etc., and meant, for example, that Roxy was under no obligation to make repairs to the building. This general understanding of the term also comports with the fact that Roxy's representation that the "property is being sold `As Is,'" is contained in a paragraph bearing the heading "Physical Condition of the Property," that further references the condition of the "grounds, buildings and improvements." Accord, Coolidge & Sickler, Inc. v. Regn, 7 N.J. 93, 96-101, 80 A.2d 554 (1951); Woodmere Associates v. Menk Corp., 316 N.J.Super. 306, 316-17, 720 A.2d 386 (App.Div.1998). On the other hand, the use of the term "broom clean," commonly found in contracts for the sale or leasing of property, connotes precisely what plaintiff argues  that there will be no dirt or debris inside the structure being sold. See Lester's Home Furnishers, Inc. v. Modern Furniture Co., 1 N.J.Super. 365, 370, 61 A.2d 743 (Ch.Div.1948); G.J. Leas. Co., Inc. v. Union Elec. Co., 854 F.Supp. 539, 549 (S.D.Ill.1994); Coldwell Banker/Hunneman v. Shostack, 62 Mass.App.Ct. 635, 818 N.E.2d 1079, 1081 (2004); 1029 Sixth, LLC v. Riniv Corp., 9 A.D.3d 142, 777 N.Y.S.2d 122, 124-26 (App.Div.2004). As can be seen from these authorities, there is nothing inconsistent about a contract that purports to convey property "as is" and in "broom clean" condition. As a general matter, the former relates to the sufficiency of the structure, the fixtures and the grounds, while the latter requires the removal of dirt and debris prior to conveying. Moreover, nothing in the record, other than Roxy's self-serving assertions, suggests any ambiguity or dispute about the meaning of these provisions.[10] *220 In the absence of a genuine dispute about their meaning, we conclude that plaintiff was correct in arguing that it was entitled to a turnover of the property, at the time of closing, free of the debris he complained of. Accordingly, even if we were to assume, arguendo, that the time of the essence notice was in conformity with the common law requirements discussed in decisions such as Paradiso and Doctorman, Roxy could not obtain the benefit of its notice because it did not demonstrate its willingness to fully perform the obligations contained in the contract.

C
The record also negates Roxy's claim that plaintiff had breached the contract by failing to appear for the alleged time of the essence notice because both parties continued to act, after that date, as if the contract remained viable. When it has been demonstrated that a party has acted inconsistently with the attempt to make the time of performance of the essence, whether the conduct precedes or follows the closing date, a waiver will be found and the parties will be deemed to have extended the time for performance for a reasonable period of time:
Where time of performance is of the essence of the contract, a party who does any act inconsistent with the supposition that he continues to hold the other party to his part of the agreement will be taken to have waived it altogether. When a specific time is fixed for the performance of a contract and is of the essence of the contract and it is not performed by that time, but the parties proceed with the performance of it after that time, the right to suddenly insist upon a forfeiture for failure to perform within the specified time will be deemed to have been waived and the time for performance will be deemed to have been extended for a reasonable time. [15 Williston, Contracts, supra, § 46:14 at 477-78; see also Salvatore, supra, 109 N.J.Super. at 91-92, 262 A.2d 409.]
As indicated earlier, after the alleged time of the essence closing date of November 7, 2000, both plaintiff and Roxy, through their attorneys, continued to discuss their future performance and what was to be done about the debris on the property. They agreed that $12,500 would be placed in escrow pending clean-up of the property and that closing would take place on January 3, 2001. In his letter of December 1, 2000 to Roxy's attorney, plaintiff's attorney stated:
This is to confirm our telephone conversation that your client will convey title with an escrow of $12,500.00 to be held towards cleaning out the property and removing containers, vehicles, etc. that are on the land.
It is agreeable that closing take place after the first of the year and I would suggest that we set up January 3rd, 2001 as a date of closing. Would you please confirm in writing that this is our understanding.
On December 13, 2000, Roxy's attorney responded and unequivocally agreed with plaintiff's attorney assessment of their discussion, stating:
This will confirm that the proposed closing date of January 3, 2001 is agreed to and that Seller will provide a credit of *221 $12,500.00 in full settlement of any claim regarding the condition of the property.
Roxy's attorney's letter indicates that a copy was sent to Heier.
The only conclusion that can be reached from these undisputed facts is that Roxy waived any right it may have had to insist upon the consequences of plaintiff's failure to appear for a time of the essence closing. Since defendants had moved for dismissal or, in the alternative, summary judgment, the Chancery judge was obligated to assume that the parties had agreed to the escrow and the postponing of the closing date. Indeed, as indicated, these facts were undisputed. Instead of supporting defendants' view that specific performance was precluded, the facts demonstrate the opposite.
Lastly, we observe that in attempting to counteract the impact of this waiver, Roxy asserted that the attorney who discussed the matter with plaintiff's attorney in November and December 2001, who received plaintiff's attorney's letter of December 1, 2001 and who sent the letter of December 13, 2001 to plaintiff's attorney, was not authorized to speak for Roxy. These assertions could, at most, create only an issue of fact that the Chancery judge could not resolve solely by resort to the papers. But we are satisfied that Roxy's self-serving claim that the attorney lacked actual authority was insufficient to create a question of fact. The genuineness of Roxy's conclusory claim that the attorney was not authorized, for Brill purposes,[11] vanishes in light of Roxy's acknowledgment that this same attorney was authorized by Roxy when he wrote the "time of the essence" letter on October 24, 2000 and when he wrote the letter of November 17, 2000 that returned the $12,000 deposit. While not disputing that the attorney received and sent letters confirming an escrow agreement as a resolution to the dispute about the condition of the premises, Heier asserted that he told Roxy's attorney that he would not agree to the escrow agreement, and upon further discussion that "Roxy would think about" the offer, but ultimately "[n]ever agree to a $12,500 reduction in the purchase price or a January 3, 2001 closing date." Without submitting a sworn statement from the attorney and without proof that plaintiff or his attorney was advised that the attorney would have no further authority to speak for Roxy, Heier claimed that if the attorney had advised plaintiff of anything other than Roxy's rejection of the escrow agreement, it was "because of a misunderstanding." We find these self-serving contentions concerning Heier's unshared belief that the attorney was no longer authorized to speak for Roxy to be insufficient to support the dismissal of plaintiff's claim or, for that matter, to defeat plaintiff's cross-motion for summary judgment.
In short, for summary judgment purposes, the Chancery judge should have proceeded on the assumption that plaintiff's contract with Roxy was binding and enforceable after November 7, 2000 and up to, and through, both the date Roxy contracted with Lindner and the date Roxy conveyed legal title to Lindner.
If these were the only circumstances relevant to plaintiff's claim for specific performance, we would conclude that plaintiff established a right to an award of specific performance. However, intervening into these circumstances was Roxy's contract with Lindner for the sale of the same property.

IV
Plaintiff's claim of specific performance requires that we determine *222 whether there was significance to the fact that Roxy contracted and closed with Lindner notwithstanding Roxy's contractual obligation to sell to plaintiff. After careful review of the record, we conclude that Lindner possessed actual knowledge, and was given constructive notice, of plaintiff's contract with Roxy  facts which preclude Lindner's claim to the status of bona fide purchaser and which relegate Lindner's rights to a position inferior to plaintiff's rights. As a result, neither Lindner's contract with Roxy nor the actual conveyance of a deed to Lindner could defeat plaintiff's right to specific performance.
Relying upon his belief that the rundown performed by Lindner's title searcher on December 18, 2000 "would not and did not reveal the notice of settlement filed by plaintiff on December 13th, 2000, because the rundown stopped at the notice of settlement filed by [Lindner] on December 11th, 2000," the Chancery judge concluded that Lindner was a bona fide purchaser and compelled the entry of summary judgment dismissing plaintiff's claim for specific performance. This determination was based upon an overstatement of the legal significance of the fact that Lindner's notice of settlement was recorded two days prior to plaintiff's, and gave no weight to Lindner's actual or constructive knowledge of plaintiff's contract with Roxy.
An analysis of the impact of the Roxy-Lindner contract, when weighed against the presence of plaintiff's pre-existing enforceable contract rights, starts with our recognition of the power of a court of equity to undo a completed conveyance to a party who does not qualify as a bona fide purchaser. See Hallock v. Bushauer, 113 N.J. Eq. 102, 166 A. 226 (E. & A.1933); Schwarz v. Munson, 94 N.J. Eq. 754, 121 A. 619 (E. & A.1923); Haughwout v. Murphy, 22 N.J. Eq. 531 (E. & A. 1871); Goldberg v. Levy, 99 N.J. Eq. 634, 134 A. 353 (Ch.1926), aff'd o.b., 101 N.J. Eq. 293, 137 A. 917 (E. & A.1927); cf., Scott v. Stewart, 1 N.J. 60, 62, 61 A.2d 765 (1948). Such a determination surely requires a balancing of the rights and equities, but, in the final analysis, a party who first contracted to purchase property later sold to another possesses, in the eyes of a court of equity, a greater right to the property than the other, so long as the other is not a bona fide purchaser. Hallock, supra, 113 N.J. Eq. at 105-06, 166 A. 226.
Since plaintiff was the first to contract for the purchase of the property in question and since his rights under that contract were not forfeited by his rightful refusal to go to closing on November 7, 2000, plaintiff would be entitled to specific performance unless Lindner qualified as a bona fide purchaser. Lindner contends that he does so qualify because he recorded his notice of settlement prior in time to plaintiff's similar recording two days later. We conclude that this contention, accepted by the Chancery judge, mistakenly oversimplifies the issue.
In arguing that Lindner's earlier recording of a notice of settlement lacks significance in this case, plaintiff urges that we should take this opportunity to define the parameters of the statutes relating to the recording of notices of settlement. We decline the invitation to do anything other than decide the case before us. In that regard, we observe that upon the recording of Lindner's notice of settlement, plaintiff and the rest of the world were given constructive notice of Lindner's contract with Roxy. That filing, however, signified only that all others who later obtained an interest in the property acquired their interest "with knowledge of the anticipated settlement and shall be subject to the terms, conditions and provisions of the deed or mortgage between the parties *223 filed," N.J.S.A. 46:16A-4, within the forty-five day period set forth in N.J.S.A. 46:16A-5. The interest that plaintiff seeks to enforce, in the first instance, is his right of equitable ownership that came into being when he contracted with Roxy on August 21, 1998. See Courtney v. Hanson, 3 N.J. 571, 575, 71 A.2d 192 (1950); In re Estate of Yates, 368 N.J.Super. 226, 235, 845 A.2d 714 (App.Div.2004). As a result, the parties to a contract such as that under consideration here possess equitable rights that are broader, and in some ways, superior to their legal rights. Professor Pomeroy described, in his seminal work, the differences in the way courts of law and courts of equity view the status of parties who contract for the sale of land. The contract purchaser's legal claim
produces no effect upon the respective estates and titles of the parties. The vendor remains to all intents the owner of the land; he can convey it free from any legal claim.... On the other hand, the vendee acquires no interest whatever in the land; his right is a mere thing in action; and his duty is a debt  an obligation  to pay the price.... No change is made until, by the execution and delivery of the deed of conveyance, the estate in the land passes to the vendee.
[Pomeroy, supra, § 314 at 691.]
A very different approach is taken when the equitable obligations of the parties are considered:
Equity views all these relations from a very different standpoint. [S]o far as the interest or estate in the land of the two parties is concerned, it is regarded as executed, and as operating to transfer the estate from the vendor and to vest it in the vendee.... By the terms of the contract, the land ought to be conveyed to the vendee, and the purchase-money ought to be transferred to the vendor; equity, therefore, regards there as done  the vendee as having acquired the property in the land, and the vendor as having acquired the property in the price. The vendee is looked upon and treated as owner of the land; an equitable estate has vested in him commensurate with that provided for by the contract ...; although the vendor remains owner of the legal estate, he holds it as a trustee for the vendee, to whom all the beneficial interest has passed.
[Id. at 691-93.]
There is nothing contained in the statutes governing the practice of recording notices of settlement that changes these fundamental rights.
Instead, N.J.S.A. 46:16A-4, and the other related statutes, merely present a purchaser with a device by which to constructively give notice of its claim to equitable title to the property mentioned. These statutes gave Lindner no ability to extinguish rights that pre-existed the date upon which he filed his notice of settlement.
We do not read Mezey v. United Jersey Bank/Central, N.A., 254 N.J.Super. 19, 603 A.2d 49 (App.Div.1992) to compel, or even suggest, a different result. Unlike the present case, Mezey involved the conflict between one party's unrecorded interest and another's recorded notice of settlement. In discussing the purpose of N.J.S.A. 46:16A-4, we then observed that "the articulated objective of the Act is to protect prospective buyers or mortgagees from acquiring deficient title because of the appearance of an intervening lien between the time the search is completed and the conveyance documents are recorded." 254 N.J.Super. at 26, 603 A.2d 49. That general observation as to the purpose of the relevant statutes, however, may not be viewed as support for the contention, urged by Lindner, that his mere filing of a notice of settlement gave him a superior *224 interest over all subsequently recorded interests, including that reflected by plaintiff's filing of a notice of settlement two days later, let alone any equitable interests that came into being prior to Lindner's notice of settlement. Moreover, the legislation in question only purports to afford protection against "unanticipated" and "unforeseen" interests. Lindner became a contract purchaser of the property at a time when he had actual notice that plaintiff also held such an interest. While Lindner obtained only Roxy's side of what had since occurred between Roxy and plaintiff  a version that, not surprisingly, suggested the availability of the property  he knew that plaintiff had a contract with Roxy and that there were discussions regarding its continuing vitality. That knowledge, without a subsequent searching inquiry into the state of the Roxy-plaintiff contract, precluded Lindner's claim of bona fide purchaser status at the time of the formation of his contract with Roxy. Moreover, when he received a deed from Roxy on December 18, 2000, Lindner not only had the same knowledge preceding the formation of his contract with Roxy but Lindner also had the added notice provided by plaintiff's filing of a notice of settlement  an event that should have raised flags as to the accuracy of Roxy's claim that the Roxy-plaintiff contract had been terminated. Mezey by no means provides support for Lindner's argument as to the significance of his filing a notice of settlement prior to the notice filed by plaintiff because there, despite the fact that the competing interest was unrecorded (and here plaintiff's interest was recorded prior to the conveyance of legal title), his actual knowledge barred his reliance upon whatever rights were provided by way of N.J.S.A. 46:16A-4. See Mezey, supra, 254 N.J.Super. at 28, 603 A.2d 49 ("We thus hold that a party who has actual knowledge of another's prospective adverse interest is not protected by the Act merely by filing of a notice of settlement.").
In short, when Lindner obtained legal title from Roxy on December 18, 2000, he did so with constructive knowledge of the notice of settlement filed by plaintiff on December 13, 2000, in the same way that plaintiff was deemed to have constructive knowledge of Lindner's contract rights when Lindner filed his notice of settlement on December 11, 2000. As can be seen, in this fashion, the statute that governs the recording of notices of settlement, as it applies to this case, neither creates nor destroys rights. When, as here, two parties record a notice of settlement regarding the same property, they have only provided notice of their claim to equitable title, and, as a result, whichever of the two takes legal title does so with constructive knowledge of the other's claim to equitable title. In this light, dueling notices of settlement, such as those recorded here, disable both parties from claiming, upon the later receipt of legal title, the status of bona fide purchaser. The wise and proper course, in those circumstances, requires that the parties thereafter explore, perhaps through litigation, the legitimacy of the other's claim to equitable title.
Since plaintiff recorded a notice of settlement on December 13, 2000 and Roxy conveyed a deed to Lindner on December 18, 2000, there can be no dispute but that Lindner took legal title to the property with constructive notice of plaintiff's claim to equitable title. That undisputed fact precludes Lindner's claim to the status of bona fide purchaser. Moreover, the record reflects that before contracting with Roxy, Lindner had actual knowledge of plaintiff's contract with Roxy. Long before the discussions and events in October and November 2000 that triggered Roxy's attempts to evade its contract with plaintiff, *225 plaintiff had discussions with Lindner regarding renovations that plaintiff had an interest in making to the property. Indeed, for that purpose, Lindner accompanied plaintiff to the property when it was inspected on October 10, 2000, at which time the extent of debris on the property was observed. In addition, prior to the formation of the Lindner-Roxy contract, Roxy actually gave Lindner a copy of its contract with plaintiff as well as a copy of Roxy's attorney's November 17, 2000 letter to plaintiff, wherein Roxy attempted to cancel its contract with plaintiff. In light of his prior possession of this information, Lindner was on notice that plaintiff might lay claim to the property that Roxy was then attempting to sell to him. Instead of exploring its viability with plaintiff, Lindner accepted Roxy's word that the contract with plaintiff had been validly terminated. He did so at his own risk. Indeed, the added fact that a notice of settlement was recorded by plaintiff after the date of the November 17, 2000 letter just further compounded the level of information possessed by plaintiff and belied any later claim that Lindner was a bona fide purchaser of this property.
We would lastly observe that we see no importance, in these circumstances, to the fact that the parties factually disputed whether a diligent title search would not include a search for instruments, such as a notice of settlement, after the date of Lindner's own notice of settlement. We have already determined that plaintiff's recording of a notice of settlement, after the recording of Lindner's notice of settlement but before the conveyance of legal title to Lindner, was of great relevance and precluded Lindner's claim to the status of bona fide purchaser. Whether title searchers customarily do, or do not, search for such filings in this timeframe is of no moment. Moreover, to the extent that what searchers actually do in searching title may have relevance in these circumstances, we would only add that plaintiff raised a question of fact about what a diligent title search would entail that would also have precluded the dismissal of his claim for specific performance by way of summary judgment.
All these circumstances demonstrate that Lindner did not qualify as a bona fide purchaser.[12] His claims of both an equitable and legal interest in the property were inferior to plaintiff's equitable interest. Thus, the circumstance that Roxy contracted with Lindner and conveyed to Lindner, instead of plaintiff, could not defeat plaintiff's claim to the remedy of specific performance. Accordingly, we reverse the order of May 29, 2001 that dismissed plaintiff's claim of specific performance and remand for further proceedings, to which we now turn.

V
In mandating further proceedings in the trial court, and in outlining the nature of those proceedings, we additionally observe that because the Chancery judge should never have dismissed the claim for specific performance, it follows that he also should not have transferred the matter to the Law Division. While this aspect of the order under review was not challenged by plaintiff, we deem it appropriate to consider the matter sua *226 sponte in light of the nature of the remand proceedings.
We initially recognize that it remains the prerogative of a Chancery judge to transfer a matter to the Law Division, when legal claims remain, once there has been a final resolution of the equitable claims,[13] unless the Chancery judge has invested a substantial amount of time in a case.[14] Thus we would find no fault in the Chancery judge's transfer of the matter if it was appropriate to vacate the restraining order and dismiss the specific performance claim. Nevertheless, with the restoration of plaintiff's claim for specific performance, we conclude that the order transferring venue to the Law Division should also be vacated. Even though the Law Division is certainly empowered to grant equitable relief just as the Chancery Division is empowered to grant legal relief, Boardwalk Properties, Inc. v. BPHC Acquisition, Inc., 253 N.J.Super. 515, 526, 602 A.2d 733 (App.Div.1991), Chancery judges possess expertise in dispensing with claims for equitable relief  an expertise that will sorely be needed in this case. Accordingly, in reversing that part of the order of May 29, 2001 that dismissed plaintiff's claim for specific performance, we also deem it appropriate to vacate that part of the order that transferred the matter to the Law Division and will require that all further proceedings in this matter, until the entry of final judgment, take place in the Chancery Division.

VI
Lastly, we address whether, despite the Chancery judge's erroneous determination, specific performance is nevertheless unavailable because Lindner has been in possession of the property for more than three years and that it may no longer be equitable to require that Lindner disgorge the property. Since we denied Lindner's motion to supplement the record in order to enlighten us as to such circumstances, we can offer no opinion as to whether the granting of equitable relief at this late date would be oppressive. We can, however, generally outline the parameters of the difficult exercise of judicial discretion now facing the Chancery judge.
The passage of more than three years since the conveyance from Roxy to Lindner will undoubtedly cast a long shadow over the future proceedings in this case. However, this passage of time  brought about not because of any inaction or delay on plaintiff's part but because of the Chancery judge's mistaken dismissal of the specific performance claim and our denial of leave to appeal  cannot alone be dispositive of plaintiff's claim. Instead, the passage of time only has relevance if the property has changed or been altered to such a degree during the time since the lifting of the temporary restraining order on May 29, 2001 that it would be unduly onerous to compel Lindner to disgorge the property, although this passage of time, if specific performance is ultimately granted, may also have relevance to any legal claims asserted among the parties that may arise as a consequence.
We have already observed that, as a general matter, the remedy of specific *227 performance may be withheld if its issuance would prove unduly oppressive. Stehr, supra, 40 N.J. at 357, 192 A.2d 569. And, as a general matter, we should further observe that oppression may result not only from the nature of the contractual undertaking itself but also "from the situation or relations of the parties exterior to and unconnected with the terms of the contract itself or the circumstances of its conclusion." Pomeroy, supra, § 185 at 475. Accordingly, in gauging the impact of any claimed oppression resulting from an award of specific performance, it is important to distinguish between those situations where the hardship came about because of the acts of the plaintiff or because of the acts of the defendant. Certainly, if plaintiff's acts or omissions would have changed the circumstances such as to create a hardship to Roxy or any other party in the future performance of the contract, then it would be inequitable to order performance. But, on the other hand,
if the subsequent events or change in circumstances which have produced the hardship, were the acts of the ... party against whom the remedy is sought ... or were acts done by his direction or under his control, the oppressive character of the performance cannot be a valid objection to a specific performance of his agreement.
[Pomeroy, supra, § 187 at 482.]
However, even when it is the seller who has brought about the circumstances that render the later performance of the contract oppressive, the court may withhold the remedy. The performance of the contract, even in that circumstance, must still be "reasonably possible," and, if not, may be refused. Id. at 483, 192 A.2d 569.[15]
In examining the record on appeal, we observe that there was no evidence presented that would suggest a hardship that was created by plaintiff. Instead, the record clearly demonstrates that it was Roxy that concluded it was on sufficiently solid ground, vis-a-vis its relationship with plaintiff, that it could rightfully sell the property to someone else. In making that assumption and taking that action, Roxy cannot now complain that to perform the contract, and potentially open itself up to the possibility of redressing any injury suffered by Lindner if he ultimately is compelled to disgorge the property, is an onerous result.
Accordingly, the hardship of which we speak does not relate to the impact of an award of specific performance on Roxy, but instead refers to a hardship that might befall Lindner as a result. That is, this case presents the circumstance of a hardship potentially being caused to a person not a party to the contract. Because we denied Lindner's motion to supplement the record in order to advise us of the present posture of the parties and this property, we cannot conclusively determine whether any alleged hardship to be suffered by Lindner might warrant withholding an order of specific performance. We would observe, however, that because Lindner obtained his equitable interest in the property with actual *228 notice of plaintiff's contract with Roxy, and later took legal title to the property while possessing this actual knowledge, and having received constructive notice as well, the mere fact that a specific performance award in favor of plaintiff would require that he disgorge the property in order that it may be conveyed to plaintiff is not necessarily the hardship of which we speak. Indeed, in light of plaintiff's superior rights, we cannot foresee what it may be that Lindner could argue as a hardship that might convince the Chancery judge that plaintiff should not obtain specific performance. Since, however, any alleged changed circumstances are unknown to us, we will leave it to the Chancery judge to assess the present status of the property and the parties, and determine whether or to what extent plaintiff would be entitled to, or must compensate for, any beneficial changes made to the property, see, generally, Pomeroy, supra, § 322 at 708-12; cf., Scott v. Stewart, supra, 1 N.J. at 62, 61 A.2d 765, considering that with the conveyance of equitable title when the plaintiff-Roxy contract was formed, Roxy held the property as trustees for plaintiff, Haughwout, supra, 22 N.J. Eq. at 546 ("After the contract, the vendor is the trustee of the legal estate for the vendee."); Pomeroy, supra, § 314 at 695 ("[B]y virtue of the contract the vendee acquires the full equitable estate in the land, the vendor holding it as trustee for him; while the vendor, in turn, acquires the equitable property in the price, the vendee being a trustee for him in respect of such purchase-price."). By purchasing the property with knowledge of the plaintiff-Roxy contract, Lindner also became a trustee for plaintiff. Haughwout, supra, 22 N.J. Eq. at 547 ("A purchaser from a trustee, with notice of the trust, stands in the place of his vendor, and is as much a trustee as he was.").
We also observe that the damage claims asserted by plaintiff against the Roxy defendants were settled and, should the court ultimately determine, in weighing all the relevant circumstances, that plaintiff is entitled to specific performance and that Lindner must disgorge the property in order to effect that relief, then the Chancery judge should also consider whether the proceedings that followed the denial of plaintiff's claim for specific performance  including the settlement of plaintiff's legal claims against Roxy and its officers  should be undone and the parties' legal claims restored. In addition, changes in circumstances occurring since the dissolving of the restraining order on May 29, 2001, may also have generated new claims. The Chancery judge, on remand, should look with liberality upon any applications to amend the pleadings and, by remanding, we do not intend to limit the future proceedings in this action solely to those claims that had been pleaded previously. See Bubis v. Kassin, 353 N.J.Super. 415, 427-28, 803 A.2d 146 (App.Div.2002). In short, due to changes in positions that may have resulted during the period of time between the mistaken dismissal of the specific performance claim and our judgment today, the Chancery judge should also assess whether any party who so altered its stance in this case ought to be relieved of the consequences of reliance upon the dismissal of the specific performance claim.

VII
In recognizing, in the section above, some of the ways in which the restoration of plaintiff's claim for specific performance will impact the future course of this lawsuit, we observe that our decision has turned this action onto a path of no slight resistance. Notwithstanding, we conclude that plaintiff's claim to specific performance was meritorious but was erroneously rejected by the Chancery judge, and that it was further delayed by *229 our denial of leave to appeal, but that it should not be lost as a result. Our judgment now imposes upon the Chancery judge the difficult task of weighing the circumstances that may have changed in the interim and, in essence, requires that the Chancery judge reassemble Humpty Dumpty. Notwithstanding the burdensome nature of this task, if it is deemed equitable to grant specific performance  after the consideration of all the circumstances we have outlined and any others that we have not foreseen and that may prove relevant  the Chancery judge should do so and must not refrain from doing so merely because of the complications and difficulties that may result. If plaintiff's claim to specific performance, after a weighing of the current circumstances, proves to be warranted, then, as Chief Judge Cardozo said, "equity will find a way, though many a formula of inaction may seem to bar the path." Graf v. Hope Bldg. Corp., 254 N.Y. 1, 171 N.E. 884, 888 (1930) (dissenting opinion).
Reversed and remanded for proceedings in conformity with this opinion. We do not retain jurisdiction.
NOTES
[1] After a trial in the Special Civil Part, the tenant that had resided in the property for twenty years appealed the judgment entered against her. In an unpublished opinion, we remanded for further findings of fact. Roxy Garment Delivery, Inc. v. Constantini, Docket No. A-3858-98T3 (March 30, 2000). On remand, the trial judge heard additional testimony and granted Roxy a judgment of possession in June 2000.
[2] Lindner was already aware of plaintiff's contract with Roxy because, in July 2000, plaintiff had contacted Lindner to do restoration work on the property and, on October 10, 2000, Lindner accompanied plaintiff on his inspection of the property in anticipation of plaintiff's closing with Roxy.
[3] This has been recognized for many centuries. There has been no departure from the general rule stated as early as in Marquis of Normandy v. Duke of Devonshire, 22 Eng. Rptr. 1169 (1697), that "[w]here no action at law will lie to recover damages, there this court will not execute the agreement in specie, for equity will never make that a good agreement which is not good by law."
[4] As recognized by our Supreme Court, the requirement that the terms of the contract be expressed with reasonable certainty has been overemphasized, and that "[a]pparent difficulties of enforcement that arise out of uncertainties in expression often disappear in the light of courageous common sense and reasonable implications of fact." Barry M. Dechtman, supra, 89 N.J. at 553, 446 A.2d 518 (quoting 5A Corbin, Contracts (2d ed., (1964), § 1174 at 283)).
[5] It should be further observed that when a seller has breached a contract to sell land, the court may assume the inadequacy of the purchaser's legal remedies because the rule has been universally established that land is unique. Friendship Manor, supra, 244 N.J.Super. at 113, 581 A.2d 893 ("There is a virtual presumption, because of the uniqueness of land and the inadequacy of monetary damages, that specific performance is the buyer's appropriate remedy for the vendor's breach of the contract to convey."); Pomeroy, supra, § 10 at 27-28.
[6] As will be seen, the fact that Lindner accompanied plaintiff on this inspection was highly significant in examining Lindner's claim to bona fide purchaser status.
[7] Plaintiff contended that the structure was "extensively littered with old furniture, office equipment, prop materials, old clothing and general debris," and that the lot "contain[ed] several containers, two motorcycles, a burnt out car, some rubber tubes and very large pile of general items piled in the back."
[8] Plaintiff's contract with Roxy stated that "[t]he closing date cannot be made final at this time," but the parties agreed to "make the estimated date for closing" for forty-five days from the date of the execution of the contract.
[9] In addition, the hardship caused Roxy in obtaining possession of the property was not a basis for altering the terms of its contract with plaintiff since Roxy had obligated itself, by way of that contract, to convey the property unoccupied.
[10] The only arguable ambiguity about these contractual terms would be whether the "broom clean" requirement applied to the debris outside the structure. Roxy, however, did not contend that it was only obligated to remove the debris from inside the structure; indeed, Roxy claimed that it had no obligation to remove any debris whether inside or out. Accordingly, Roxy demonstrated its unwillingness to perform the contract as promised at the time of formation.
[11] Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995).
[12] Because of the manner in which we have resolved Lindner's claim of bona fide purchaser status, we need not consider plaintiff's alternative argument that Lindner could not be a bona fide purchaser because he did not pay the consideration in full but, instead, gave Roxy a purchase money mortgage for a portion of the purchase price. See, e.g., Scult v. Bergen Valley Builders, Inc., 76 N.J.Super. 124, 183 A.2d 865 (Ch.Div.1962), aff'd on other grounds, 82 N.J.Super. 378, 197 A.2d 704 (App.Div.1964).
[13] This is true even though the propriety of the lodging of a case in the Chancery Division is determined by the "facts existing at the inception of the suit." Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379, 393, 55 A.2d 250 (E. & A.1947).
[14] In Steiner v. Stein, 2 N.J. 367, 378, 66 A.2d 719 (1949), the Court held that "[w]ere the trial judge in whichever division he is sitting not to hear the entire case once he has assumed jurisdiction, all of the confusion and waste of judicial effort which the framers sought to eliminate would reappear."
[15] While the exceptions are undoubtedly few, in observing that this rule is not absolute, Professor Pomeroy alludes to an English case where the defendant had contracted to "rebuild" several houses. Defendant only built two and repaired the others, putting them in excellent condition so they were made substantially good as new. While defendant had not performed as agreed, it was held that specific performance would not be ordered because of the hardship that would be caused to defendant  even though he had unilaterally created the hardship  in pulling down the repaired houses and building new ones in their place. Pomeroy, supra, § 186 at 480, 483 (citing City of London v. Nash, 29 Eng. Rptr. 1095 (1747)).